CHIPPEWA CREE TRIBE OF THE
ROCKY BOY'S RESERVATION,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–675 L.

United States Court of Federal Claims.

Jan. 26, 2006.

Melody L. McCoy, Boulder, CO, for plaintiff.

Carol Catherman, with whom was Kelly A. Johnson, Acting Assistant Attorney General, Environment & Natural Resources Division, Department of Justice, Washington, DC, for defendant. Elisabeth C. Brandon, Office of the Solicitor, U.S. Department of the Interior, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

In 1863 and 1892, plaintiffs' ancestors ceded lands totaling some 20 million acres to the United States. The Indian Claims Commission and this court awarded compensation for those lands. The compensation awarded was then held in trust by the United States. This suit seeks damages for mismanagement by the United States of the funds it held in trust.

## I. Background

On September 30, 1992, the Turtle Mountain Band of Chippewa Indians, the Chippewa Cree Tribe of the Rocky Boy's Reservation, and the Little Shell Tribe of Chippewa Indians of Montana filed this action on their own behalf, on behalf of their respective members, and on behalf of all beneficiaries of judgment funds awarded in certain settlements of land cession compensation suits. The complaint sought money damages for the alleged mismanagement of judgment funds awarded by the Indian Claims Commission and affirmed by this court and thereafter appropriated and deposited into Treasury accounts for plaintiffs' benefit. *See* Plaintiffs' Class Action Complaint filed September 30, 1992 (Compl.) at 1, 8–11.

The court stayed the proceedings at the request of the parties by Order of January 14, 1993 to allow completion by the United States of, and response by plaintiffs to, account reconciliation reports undertaken as part of the Tribal Trust Fund Reconciliation Project carried out by Arthur Andersen LLP under contract to the Department of the Interior. Order of January 14, 1993; *see also* Plaintiffs' Memorandum in Support of their Motion for Summary Judgment on the Money Mandating-ness of the General Tribal Trust Fund Investment Statutes, 25 U.S.C. §§ 161a and 162a ( Pls.' Inv. MSJ Mem.) at 16. Plaintiffs filed a responsive assessment to the Arthur Andersen reports in July 1997 to which defendant responded in October 1997. Proceedings were again stayed by Order of November 26, 1997. Order of November 26, 1997. Subsequent orders extended the stay through July 2002 to allow the parties to pursue discussions regarding the possibility of a negotiated settlement. By its Order of July 31, 2002, the court lifted the stay and established filing deadlines related to plaintiffs' motion to file an amended complaint and the relevant responsive pleadings. Order of July 31, 2002 at 1–2.

Plaintiffs' First Amended Class Action Complaint (Pls.' 1st Am. Compl.) was filed in September 2002 and Defendant's Answer to the First Amended Complaint was filed in October 2002. A motion regarding joinder of parties and the application of *parens patriae* doctrine prior to class certification was deemed moot by the court's Order of September 17, 2003. Order of September 17, 2003 at 2. Plaintiffs' Motion to Amend the Complaint to Add the White Earth Tribe as a Named Plaintiff, filed in August 2003, re-

mains before the court. On September 3, 2004 plaintiffs filed their Renewed Motion for Class Certification with the court along with Plaintiffs' Second Amended Class Action Complaint. Defendant filed its Amended and Corrected Answer on November 23, 2004. By its Order of January 12, 2005 the court scheduled briefing on: (1) "the extent to which the claims of the individual plaintiffs and the White Earth Tribe are barred by the six-year statute of limitations under 2[8] U.S.C. § 2501 and/or laches, and/or relate back to the date of the filing of the initial Complaint in 1992," Order of January 12, 2005 at 1, ¶ 1, and (2) "the applicable standard of investment duties of the Secretary of the Department of the Interior," *id.* at 1, ¶ 2. The court also scheduled briefing on Plaintiffs' Renewed Motion for Class Certification. *Id.* at 1, ¶ 1.

The court now has before it three related motions seeking the following determinations: (1) whether plaintiffs' investment claims are founded on a statutory duty the violation of which may be fairly interpreted as mandating a right of recovery in damages; (2) whether or not the claims of the plaintiffs whom plaintiffs seek to represent in this action and the claims of the White Earth Tribe whom plaintiffs seek to join in this action are barred by the statute of limitations; and (3) whether the case may proceed as a class action or otherwise address the claims of the large number of beneficiaries of the judgment funds.

Before the court on the statutory duty to invest issue are: Plaintiffs' Motion for Summary Judgment on the Issue of the General Tribal Trust Fund Investment Statutes Being "Money–Mandating" (Pls.' Inv. MSJ) and their supporting Memorandum (Pls.' Inv. MSJ Mem.); Defendant's Cross–Motion for Partial Summary Judgment on Money–Mandating Issues and Opposition to Plaintiffs' Motion for Summary Judgment (Def.'s Cross–MSJ) and its supporting Memorandum (Def.'s Cross–MSJ Mem.); Plaintiffs' Consolidated Reply in Support of Their Motion for Summary Judgment on the Money Mandatingness of the General Tribal Trust Fund Investment Statutes, Including 25 U.S.C. §§ 161a and 162a, and in Opposition to Defendant's Cross Motion for Partial Summary Judgment on Money–Mandating Issues (Pls.' Consol. Reply); and Defendant's Reply Memorandum in Support of its Cross–Motion for Partial Summary Judgment on Money–Mandating Issues (Def.'s Cross–MSJ Reply).

Before the court on the statute of limitations issue are: Defendant United States' Motion to Dismiss or in the Alternative for Partial Summary Judgment (Def.'s SOL MTD); Defendant United States' Memorandum in Support of Motion to Dismiss or in the Alternative for Partial Summary Judgment (Def.'s SOL MTD Mem.); Defendant United States' Reply Memorandum in Support of its Motion to Dismiss or in the Alternative for Partial Summary Judgment (Def.'s SOL Reply); and Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Partial Summary Judgment (Pls.' SOL Opp.).

Before the court on the class certification issue are: Plaintiffs' Renewed Motion for Class Certification (Pls.' Ren. Class Mot.); Plaintiffs' Second Amended Class Action Complaint (Pls.' 2d Am. Compl.);[1] Plaintiffs' Reply in Support of Their Renewed Motion for Class Certification (Pls.' Class Reply); Plaintiffs' Sur–Sur Reply in Support of Their Renewed Motion for Class Certification (Pls.' Class S–S Reply); Defendant's Opposition to Plaintiffs' Renewed Motion for Class Certification (Def.'s Class Opp.); and Defendant United States' Sur–Reply Memorandum in Opposition to Plaintiffs' Renewed Motion for Class Certification (Def.'s Class S–Reply). The court also relies on the Transcript of the Oral Argument of October 25, 2005(Tr.).

## II.  Discussion

### A.  Jurisdiction

Through the Tucker Act, 28 U.S.C. § 1491 (2000), Congress authorized the United

---

1. Plaintiffs' Renewed Motion for Class Certification and Plaintiffs' Second Amended Class Action Complaint were filed under seal. Because this Opinion focuses on legal issues and general factual background, and does not disclose the names of individual plaintiffs, the court perceives no need to publish this Opinion under seal or with any redactions.

States Court of Federal Claims to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Indian Tucker Act makes explicit that this court's jurisdiction extends to "any tribe, band, or other identifiable group of American Indians" for claims against the United States accruing after August 13, 1946. 28 U.S.C. § 1505 (2000) (collectively, the Tucker Act and the Indian Tucker Act are referred to as the Tucker Acts). While the Tucker Acts provide the "clear statement from the United States waiving sovereign immunity" required to establish jurisdiction over a suit against the government, *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), the Tucker Acts do not in themselves create a substantive right enforceable against the United States for money damages, *United States v. Mitchell*, 445 U.S. 535, 538–40, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*).

The plaintiff bears the burden of establishing subject matter jurisdiction. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). If the facts on which jurisdiction is predicated are challenged, the plaintiff must support the factual basis for jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988); *McNutt*, 298 U.S. at 189, 56 S.Ct. 780. The court must dismiss the action if jurisdiction is found lacking. *See* Rule 12(h)(3) of the Rules of the Court of Federal Claims (RCFC) (2005).

The framework for determining whether a duty and, in particular, a fiduciary duty established in statute, regulation or contract is money-mandating is addressed in *Mitchell I* and *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitch-*

ell II) and, more recently, in *White Mountain Apache* and *United States v. Navajo Nation*, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) (*Navajo Nation*). *See, e.g., Navajo Nation*, 537 U.S. at 503, 123 S.Ct. 1079 (noting that "*Mitchell I* and *Mitchell II* are the pathmarking precedents" in determining the existence of a money-mandating duty); *Fisher v. United States*, 402 F.3d 1167, 1173–1174 (Fed.Cir.2005) (reviewing the rearticulation of standards in *White Mountain Apache* and *Navajo Nation* regarding plaintiff's burden in establishing whether a duty is money-mandating); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 58 Fed.Cl. 77, 81 (2003) (noting that "[t]he framework within which this dispute must be resolved" had been restated in *Navajo Nation* and *White Mountain Apache* ).

In *Mitchell I*, individual Indian allottees of land in the Quinault Reservation sought monetary damages from the United States for failure to manage timber resources on allotted land, an alleged breach of government's fiduciary duty under the General Allotment Act of 1887(GAA).[2] 445 U.S. at 537, 100 S.Ct. 1349. The Court reviewed the language of the GAA and its legislative history and found that the intent of Congress expressed in the GAA was that the United States hold the land allotted to individual Indians in trust so as "to prevent alienation of the land" and to avoid state taxation of allotments. *Id.* at 544, 100 S.Ct. 1349. Management of the allotments was left to the allottees, not to the trustee, *id.* at 543, 100 S.Ct. 1349, and the Court concluded that the express language of the General Allotment Act established only a limited trust relationship and "cannot be read as establishing that the United States has a fiduciary responsibility for management of allotted forest lands," *id.* at 546, 100 S.Ct. 1349.

Having concluded in *Mitchell I* that the GAA did not create specific fiduciary duties regarding timber management, the Court then considered whether other sources of substantive law imposed such duties on the United States. *Mitchell II*, 463 U.S. at 219–

---

**2.** Indian General Allotment Act, Act of February 8, 1887, ch. 119, 24 Stat. 388, as amended, codified as amended at 25 U.S.C. §§ 331–358 (2000).

23, 103 S.Ct. 2961. Based on its review, the Court found that "[t]he timber management statutes and the regulations promulgated thereunder establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of tribal timber." *Id.* at 222, 103 S.Ct. 2961 (citations omitted). These fiduciary responsibilities in turn "directly support[ ] the existence of a fiduciary relationship." *Id.* at 224, 103 S.Ct. 2961. The Court then addressed whether these duties were money mandating and concluded that "the statutes and regulations at issue here can fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities." *Id.* at 228, 103 S.Ct. 2961. "Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Id.* at 226, 103 S.Ct. 2961. Although the substantive law that established these duties did not expressly declare that their breach would be compensable, the Court noted that "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication.'" *Id.* at 217 n. 16, 103 S.Ct. 2961 (quoting *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1007 (Ct.Cl.1967)).

The Supreme Court revisited the "fair interpretation" test articulated in *Mitchell II* in a 2003 case involving the government's alleged failure to maintain facilities it held in trust for the White Mountain Apache Tribe on the former Fort Apache Military Reservation. *White Mountain Apache,* 537 U.S. at 469, 474, 123 S.Ct. 1126. In *White Mountain Apache,* the Court noted that the governing statute went beyond the "bare" or limited trust in *Mitchell I* by "invest[ing] the United States with discretionary authority to make direct use of portions of the trust corpus." 537 U.S. at 475, 123 S.Ct. 1126. By exercising daily supervision and occupation of the trust property, the Court concluded that "the United States ... has obtained control at least as plenary as its authority over the timber in *Mitchell II.*" *Id.* The Court then found a money-mandating responsibility to manage and conserve the trust property in

the common-law duty of a trustee to preserve and maintain trust assets, despite the absence of explicit language in the governing statute imposing a fiduciary duty of conservation and management. *Id.* "It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." *Id.* at 473, 123 S.Ct. 1126.

In an opinion interpreting the Indian Mineral Leasing Act[3] handed down on the same day as *White Mountain Apache,* the Court was unable to find in the statutes and regulations governing coal mining leases the requisite "rights-creating or duty-imposing statutory or regulatory prescriptions" that could "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained" from an alleged breach by the trustee. *Navajo Nation,* 537 U.S. at 503, 506, 123 S.Ct. 1079. Far from finding money-mandating provisions in the substantive law, the Court emphasized that "no provision of the [governing statute] or its regulations contains *any* trust language with respect to coal leasing." *Id.* at 508, 123 S.Ct. 1079. While the Secretary of the Interior was required to approve leases negotiated between the Navajo Tribe and a third party, the approval function did not include a duty to ensure a rate of return higher than the minimum royalty specified in the regulations. *Id.* at 510–11, 123 S.Ct. 1079. The rate negotiated by the Navajo Tribe and the lessee and incorporated in the lease approved by the Secretary exceeded the regulatory floor. *Id.* at 510, 123 S.Ct. 1079. The lease was in conformity with the statute and regulations then in effect and the Secretary was not under any fiduciary or other duty to maximize the return to the Navajo Tribe from its coal leases; therefore, as in *Mitchell I,* the Court found that the government was not in breach of a money-mandating fiduciary duty. *Id.* at 514, 123 S.Ct. 1079 ("[W]e have no warrant from any relevant statute or regulation to conclude that his conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act.").

---

**3.** Indian Mineral Leasing Act of 1938 (IMLA), 25    U.S.C. §§ 396a–396g (2000).

### B. Whether a Money–Mandatory Fiduciary Duty Exists

### 1. The Creation of the Pembina Awards

The funds at issue in this case were awarded in suits brought by descendants of the Red Lake Band of Chippewa Indians and the Pembina Band of Chippewa Indians challenging the compensation received for lands located along the Red River in what are now the states of North Dakota and Minnesota. The lands were ceded to the United States in two separate agreements. *See Red Lake, Pembina and White Earth Bands v. United States,* 164 Ct.Cl. 389, 392–93, 1964 WL 8580 (1964); *Turtle Mountain Band of Chippewa Indians v. United States,* 203 Ct.Cl. 426, 490 F.2d 935, 938 (1974). The first suit sought compensation for 7,488,280 acres ceded to the United States under the Treaty of October 2, 1863, 13 Stat. 667, as modified by the Treaty of April 12, 1864 (1863 Treaty), for which the United States had paid eight cents an acre. *Red Lake, Pembina and White Earth Bands,* 164 Ct.Cl. at 394. The Indian Claims Commission found the payment to be unconscionable and granted a gross award of $3,369,726.00 to the plaintiff tribes, with a net value of $2,760,245.64. *Id.* One third of the gross settlement was adjudged for the Pembina Band. *Id.* at 399. The Court of Claims also addressed the distribution of the award and determined that "the award must go to the tribal entities rather than descendants of the bands." *Id.*

Congress appropriated funds to satisfy this and a number of other settlements and judgments by the Deficiency Appropriation Act of 1964, Pub.L. No. 88–317, 78 Stat. 204. Chapter XI of the Deficiency Appropriation Act of 1964 (1964 Award) did not recognize the amounts or terms of the individual settlements and judgments funded but rather made a bulk appropriation with generic provisions regarding the requirement for finality of claims prior to distribution and the payment of interest. *See* Pub.L. No. 88–317, ch. XI, 78 Stat. 204, 213 (1964). The appropriation was for $12,831,443 plus whatever amount was required by individual judgments or by law to pay interest. *Id.* The 1964 Award included a provision stating that payment of interest where appropriated on

the claims and settlements would not continue beyond thirty days from the date of approval of the appropriation, unless specific provision was made in the judgment or by law. *Id.* The 1964 Award stated:

> For payment of claims as settled and determined by departments and agencies in accord with law, and judgments rendered against the United States by the United States Court of Claims and United States district courts, as set forth in Senate Documents Numbered 50, 74, and 75 and House Document Numbered 300, Eighty-eighth Congress, $12,831,443, together with such amounts as may be necessary to pay interest (as and when specified in said judgments or provided by law) and such additional sums due to increases in rates of exchange as may be necessary to pay claims in foreign currency: *Provided,* That no judgment herein appropriated for shall be paid until it shall have become final and conclusive against the United States by failure of the parties to appeal or otherwise: *Provided further,* That, unless otherwise specifically required by law or the judgment, payment of interest wherever appropriated for herein shall not continue for more than thirty days after the date of approval of this Act.

*Id.* The express language of the 1964 Award revealed little of the nature of the individual claims or the judgments funded, but did express a clear intent to limit payment of interest on the funds appropriated to that provided for by the terms of the judgment or other laws. *See id.*

In 1971, Congress approved a plan for the distribution of the 1964 Award. Pub.L. No. 92–59, 85 Stat. 158 (1971) (codified at 25 U.S.C. §§ 1241–1248 (2000)) (1971 Distribution Act). The 1971 Distribution Act apportioned the award among four beneficiaries: (1) the Minnesota Chippewa Tribe (White Earth Band), (2) the Turtle Mountain Band of Chippewas of North Dakota, (3) the Chippewa Cree Tribe of Montana, and (4) the group of lineal descendants of the Pembina bands subject to the 1863 Treaty who were not eligible for membership in any of the three named beneficiary tribes (the nonmember Pembina descendants). *See* 25

U.S.C. § 1244. The Secretary of the Interior was instructed to establish a roll of eligible Pembina descendants, 25 U.S.C. § 1242, and to apportion funds among the three named tribes according to their enrolled membership, with the remaining funds distributed in equal shares among the members of the group of non-member Pembina descendants. 25 U.S.C. § 1244. The three named tribal beneficiaries also requested that their portions of the 1964 Award be distributed to eligible members on a per capita basis. Pls.' Inv. MSJ at 12. Distribution of the 1964 Award began in October 1984, twenty years after appropriation of the judgment funds.

The second suit sought just compensation for about 10 million acres of land in North Dakota that was not ceded under the 1863 Treaty but from which many of the Pembina Chippewa were subsequently compelled to move on threat of loss of their annuities negotiated under the 1863 Treaty. *See Turtle Mountain Band,* 490 F.2d at 938. The McCumber Commission[4] negotiated an agreement with the Chippewas in October 1892 (1892 Agreement), amended and approved by Congress in 1904, which ceded the 10 million acres in question to the United States. Lieu Lands Act of 1904, ch. 1402, 33 Stat. 189, 194. The Chippewas were paid $1 million for the 10 million acres of land, 33 Stat. at 195, leading many to refer to the 1892 Agreement as the "Ten Cent Treaty." *See* Def.'s MTD, Appendix (App.) D at 16 (Letter from William Gipp, Acting Area Director, Tribal Government Services). In a suit brought by the Turtle Mountain Band of Chippewa Indians, the Pembina Band of Chippewa Indians, and the Little Shell Band of Chippewa Indians, the Indian Claims Commission awarded the plaintiffs $52,277,337.97 as additional compensation for land ceded by the 1892 Agreement. *See*

*United States v. Turtle Mountain Band of Chippewa Indians,* 222 Ct.Cl. 1, 612 F.2d 517, 518–19 (1979) (noting that the award represents "the difference between the fair market value of the land on the date of extinguishment of the aboriginal title and the compensation the government previously paid for the land."). The net award of $47,376,622.93, reflecting offsets and adjustments of $5,150,715.05, was decided in a partial judgment of March 18, 1980. *Turtle Mountain Band of Chippewa Indians v. United States,* 229 Ct.Cl. 872, 872 (1980). The net award was augmented by $4,900,715.04 awarded in a December 1, 1981 judgment, bringing the total of the two awards to nearly $52 million. *Id.* Congress made two separate appropriations, in March 1980 and December 1981, constituting collectively the 1980 Award.[5] *Id.* The court refers to the 1964 Award and the 1980 Award collectively as the Pembina Awards.

Congress provided for the use and distribution of the 1980 Award in December 1982. *See* Pub.L. No. 97–403, 96 Stat.2022 (1982) (1982 Distribution Act). Section 2 of the 1982 Distribution Act divided the appropriated funds and the accrued interest and investment income among the Turtle Mountain Band, the Chippewa Cree Tribe of Rocky Boy's Reservation, the Minnesota Chippewa Tribe, the Little Shell Band of Chippewa Indians, and the group of non-member lineal Pembina descendants. *Id.* § 2. For the four tribes or bands, the funds were to be divided into two portions: 80% of the funds were to be distributed among the eligible members of the tribe or band in the form of per capita payments, with the remaining 20% of funds retained in the Treasury and available to the governing body of the tribe or band on the basis of an annual program budget, subject to the approval of the Secretary of the Interior. *Id.* §§ 3–6. A partial distribution of the

---

4. Congress established the McCumber Commission to acquire the land following two unsuccessful attempts to negotiate a land cession with the Pembina Band. *Turtle Mountain Band,* 490 F.2d at 938.

5. Neither plaintiffs nor defendant has provided the text of the appropriation acts that together funded the 1980 Award. See Pls.' Consol. Reply at 11 ("Plaintiffs never have seen the actual

congressional provisions for [the *1980* Award] appropriations."); Def.'s Cross–MSJ Reply at 8, n. 7 ("There is one piece of legislation specific to Pembina that is not part of this record, the act appropriating funds to satisfy the 1980 Award."). The court has not yet been able to locate the document, but does not believe that circumstance would likely affect its determination of the motions before it.

per capita funds was initiated in May 1988 and the final per capita distribution was carried out in 1994. Pls.' Inv. MSJ Mem. at 14. Defendant continues to hold the 20% of funds retained for the four tribal beneficiaries for tribal programs. *Id.* at 14–15.

### 2. The Parties' Arguments and the *Whiskers* Case

Plaintiffs contend that the Pembina Awards were, when appropriated by Congress to satisfy the judgments rendered by this court, then and thereafter held by the government in trust for the Indian owners of these funds and that fiduciary obligations attached to the Pembina Awards. *See* Pls.' Inv. MSJ Mem. at 15. Plaintiffs argue that the specific money-mandating contours of the relationship are defined by the investment statutes, including 25 U.S.C. §§ 161a and 162a (2000), that apply specifically to Indian funds held in trust by the United States. *See id.* at 21, 23–24. The government's alleged failure to execute properly the fiduciary duties attendant to its management of the Pembina Awards from the time the funds were appropriated through the time the funds were distributed and afterwards forms the basis of plaintiffs' breach of trust claim. *See* Pls.' 2d Am. Compl. at 22–23, ¶¶ 64–68. Specifically, plaintiffs allege that the defendant as trustee (1) failed to invest the Pembina Awards in a timely manner, *id.* at 23, ¶ 67, and (2) failed to invest the Pembina Awards so as to attain the "maximum investment return possible," *id.* ¶ 68. Plaintiffs claim that the government breached its trust obligations under the general investment statutes applied to trust funds, including 25 U.S.C. §§ 161, 161a and 162a, and that damages suffered due to the alleged breaches of fiduciary duties were compensable. *See* Pls.' Inv. MSJ Mem. at 21–25.

Defendant, while acknowledging that a general trust relationship exists between the government and the Pembina Awards beneficiaries, *see* Def.'s Cross–MSJ Mem. at 12 n. 7, argues that this general trust relationship is insufficient to establish a fiduciary duty the breach of which would constitute grounds for the payment of money damages under the Supreme Court's holding in *Mitchell I*

and *Navajo Nation, see* Def.'s Cross–MSJ Reply at 14. Defendant argues that "[i]n appropriating the funds [to satisfy the 1964 judgment], Congress neither characterized them as 'trust funds' nor imposed on Interior an obligation to hold them as 'trust funds.'" Def.'s Cross–MSJ Mem. at 12. Defendant's motion for partial summary judgment distinguishes between portions of the Pembina Awards that were distributed on a per capita basis to eligible beneficiaries and portions that were specifically designated as tribal program funds to be held in trust by the government. Def.'s Cross–MSJ at 2–3. Defendant argues that, because neither the acts appropriating the Pembina Awards nor the respective distribution acts stated that the per capita portions of the awards were held in trust and therefore subject to investment by the government, no such duty applied to the per capita funds. *Id.* at 12–13. The only express duty to invest the Pembina Awards, according to defendant, is found in the language of the 1982 Distribution Act providing that "[t]wenty per centum of such funds shall be held in trust and invested by the Secretary for the benefit of the members" of the respective beneficiary tribe, band or group. *Id.* at 13 n. 8 (citation omitted). Defendant, emphasizing the language of 25 U.S.C. §§ 161a and 162a(a), argues that the "[the Department of the] Interior was *required* to invest the per capita funds under the provisions of Sections 161a and 162a only if Congress designated those monies as 'trust funds,' that is, as funds to be held in trust." Def.'s Cross–MSJ at 11–12.

Plaintiffs contend that all funds appropriated by Congress to satisfy a judgment are, when deposited in the Treasury to the credit of an Indian beneficiary, "held in trust" by the government. Pls.' Consol. Reply at 4 (asserting that "the act of appropriation to an agency such as the Treasury in and of itself creates the trust"). Plaintiffs state that the "general rule" is that funds appropriated to satisfy judgments, including those funds to be distributed on a per capita basis, are trust funds. *Id.* at 3. In support of this position, plaintiffs rely on, *inter alia, Cheyenne–Arapaho Tribes of Indians of Okla. v. United States,* 206 Ct.Cl. 340, 512 F.2d 1390, 1392 (1975) ("It is clear from past actions of this

court and from the Supreme Court, and from the actions of both Congress and the Executive Branch, that funds appropriated to Indians to satisfy judgments of the Indian Claims Commission or of this court ... are, when kept in the Treasury, held in trust for the Indians."); *Loudner v. United States*, 108 F.3d 896, 900 (8th Cir.1997) ("There is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust."); *Angle v. United States*, 709 F.2d 570, 575 (9th Cir.1983) ("We have been able to find, and the parties have cited to us, no evidence of 'explicit language' in the statute or its history indicating that the judgment fund moneys were not to be held in trust for the California Indians, pending distribution."); *Rogers v. United States*, 697 F.2d 886, 890 (9th Cir.1983) ("With this strong tradition [of government's 'unique trust obligation' to Indian nations] in mind, we recognize[ ] that there is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust."); *Moose v. United States*, 674 F.2d 1277, 1281 (9th Cir.1982) ("[W]here the United States holds funds for Indian tribes, a trust relationship exists unless there is explicit language to the contrary ...."); *LeBeau v. United States*, 215 F.Supp.2d 1046, 1063 (D.S.D.2002) (finding that, despite the lack of explicit reference to trust status in the relevant acts, "the Judgment Fund at issue in this case is held in trust by the defendant and is subject to the specific interest provisions in 25 U.S.C. § 161a"); *Sisseton–Wahpeton Sioux Tribe v. United States*, 686 F.Supp. 831, 836 (D.Mont.1988) ("[T]he court recognizes that an Act of Congress appropriating funds, in satisfaction of a judgment of the Indian Claims Commission, creates a fund held in trust for the 'tribes, band, or groups' in whose favor the judgment of the Indian Claims Commission was entered.").

Notwithstanding the authorities cited by plaintiffs, defendant grounds its argument on the assumption that a trust relationship can only be found if Congress expressly invokes its creation in each instance. *See* Def.'s Cross–MSJ Reply at 5 ("Congress differentiates and uses precise terminology when it specifies that funds are to be held 'in trust' or subject to a duty to invest."). Defendant relies on the holding and analysis of *Whiskers v. United States*, 600 F.2d 1332 (10th Cir.1979), *see* Def.'s Cross–MSJ at 14; Def.'s Cross–MSJ Reply at 14, as support for its argument that the government did not assume a trust relationship in regard to its management of the judgment fund accounts established by the Pembina Awards. Because this is the principal authority on which defendant relies and because the analysis in the *Whiskers* case would, if persuasive, effectively dispose of plaintiffs' claim in defendant's favor, the court begins by analyzing the *Whiskers* decision.

The facts in *Whiskers* are similar to facts of this case. In both cases, Indian plaintiffs had obtained judgments awarding compensation for the taking of aboriginal homelands without just compensation. *Whiskers* was a suit brought by individual Indians against the United States alleging that, because of the misconduct of the government, the Indians had failed to receive their rightful shares of judgment funds provided under the Second Supplemental Appropriations Act, Pub.L. No. 89–16, 79 Stat. 108 (1965), and the Southern Paiute Judgment Distribution Act, Pub.L. No. 90–584, 82 Stat. 1147 (1968). *Whiskers*, 600 F.2d at 1334. The *Whiskers* court noted that "[t]he settlement was stipulated to before the Indian Claims Commission." *Id.* at 1333 n. 1.

In this case, plaintiffs allege that they have been damaged by "misaccounting and misinvestment" by the government of the Pembina Awards in violation of its fiduciary responsibilities. Pls.' Inv. MSJ Mem. at 15. The Pembina Awards were made as a result of judgments issued in favor of the Pembina Bands of Chippewa Indians and the Red Lake Band of Minnesota Chippewa Indians by the Indian Claims Commission. *Id.* at 11–13.

The 1965 congressional appropriation for the Southern Paiute Nation on which the *Whiskers* plaintiffs based their claim employed virtually identical language to that used for the 1964 Award to the Pembina to describe the purpose and restrictions of the

appropriation, with the only differences being the document number, the identification of the Congress enacting the appropriation statute, and the amount of the appropriation.[6] The respective distribution acts[7] also followed the same structure and called for similar actions by the Secretary of the Interior in preparing a roll of all those eligible to participate in the distribution of the funds appropriated for the judgments "together with the interest thereon." The *Whiskers* court acknowledged that, through the Tucker Act, 28 U.S.C. § 1491, the United States had consented to be sued in the district courts and Court of Claims "whenever ... a substantive right falling within the categories enumerated in the Tucker Act otherwise exists." 600 F.2d at 1334–35 (citing *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). As the *Whiskers* court noted, this substantive right came not from the Tucker Act, but a federal statute or regulation that " 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " *Id.* at 1335 (citing *Testan*, 424 U.S. at 400, 96 S.Ct.

948, quoting *Eastport S.S. Corp.*, 372 F.2d at 1009). The *Whiskers* court noted that neither the appropriation act nor the distribution act in question indicated that the funds were to be held in trust pending distribution. *Whiskers*, at 1335–36. The *Whiskers* court rejected, without analysis, the applicability of several statutes concerning trusts, including 25 U.S.C. § 161, of possible relevance to plaintiffs' investment and trust obligation claims in the present case:

> Plaintiffs refer to several statutes concerning trusts, but none has applicability to the fund in question. *E.g.*, 25 U.S.C. § 160 (1976), (concerning stocks, bonds, and other securities held by the Secretary for certain Indians on June 10, 1876); 25 U.S.C. § 161 (1976) (Secretary authorized to deposit into the Treasury certain funds held by him as trustee on April 1, 1880); 31 U.S.C. § 547a (1976) (investment procedure for trust funds).

*Id.* at 1336.

The *Whiskers* court reviewed language from § 20 of the Permanent Appropriation

6. Both the appropriation made for the Southern Paiute Nation settlement, cited below, and that for the 1964 Award to plaintiffs, Pub.L. No. 88–317, ch. XI, 78 Stat. 204, 213 (1964), include funds for a number of separate claims and judgments. The pertinent parts of the appropriation that included funds for the Southern Paiute Nation settlement at issue in *Whiskers* provide, with the words that differ from the appropriation for the 1964 Award to the Pembina enclosed in brackets:

> For payment of claims settled and determined by departments and agencies in accord with law and judgments rendered against the United States by the United States Court of Claims and United States district courts, as set forth in Senate Document Numbered [19, Eighty-ninth Congress and House Document Numbered 113, Eighty-ninth Congress, $31,411,444], together with such amounts as may be necessary to pay interest (as and when specified in said judgments or provided by law) ... *Provided further,* That unless otherwise specifically required by law or by the judgment, payment of interest wherever appropriated for herein shall not continue for more than thirty days after the date of approval of this Act.

Second Supplemental Appropriation Act, Pub.L. No. 89–16, tit. IV, 79 Stat. 81, 108–109 (1965) (brackets added). The pertinent parts of the appropriation act that included funds for the 1964 Award to the Pembina provide, with the words that differ from the appropriation for the

1965 Southern Paiute Nation settlement enclosed in brackets:

> For payment of claims [as] settled and determined by departments and agencies in accord with law, and judgments rendered against the United States by the United States Court of Claims and United States district courts, as set forth in Senate Document[s] [Numbered 50, 74, and 75 and House Document Numbered 300, Eighty-eighth Congress, $12,831,443], together with such amounts as may be necessary to pay interest (as and when specified in said judgments or provided by law) ... *Provided further,* That unless otherwise specifically required by law or the judgment, payment of interest wherever appropriated for herein shall not continue for more than thirty days after the date of approval of this Act.

Deficiency Appropriation Act of 1964, Pub.L. No. 88–317, ch. XI, 78 Stat. 204, 213 (brackets added).

7. The act providing for the distribution of the Southern Paiute judgment fund (Southern Paiute Judgment Distribution Act), Pub.L. No. 90–584, 82 Stat. 1147 (1968), was enacted three years after the appropriation for the judgment fund. The act providing for the distribution of the 1964 Award for the Pembina Band of Chippewa Indians was enacted seven years after the appropriation of its corresponding judgment fund. *See* Pub.L. No. 92–59, 85 Stat. 158 (1971) (1971 Distribution Act).

Repeal Act of 1934 (PAR Act),[8] ch. 756, § 20, 48 Stat. 1224, 1233 (codified as amended at 31 U.S.C. § 1321 (2000)). The *Whiskers* court noted that "[p]laintiffs place substantial reliance on 31 U.S.C. § 725s(a)(20) (1976),[9] contending it declares that the judgment fund, while held in the Treasury pending distribution, was held in trust." *Whiskers,* 600 F.2d at 1336 (footnote omitted). The court observed that "at first blush" the section appeared to support the plaintiffs' argument, but found that "our independent research leads us to conclude that the section does not have the sweeping meaning that a simple reading of it might indicate." *Id.* The *Whiskers* court based its conclusion on an analysis of the specific trust fund listed in 31 U.S.C. § 1321(a)(20) entitled "Indian moneys, proceeds of labor, agencies, schools, and so forth." *Id.* at 1336–37. With a focus on 31 U.S.C. § 1321(a)(20), the court reviewed the legislative history of the PAR Act and, relying on statements by the Chief Finance Officer of the Indian Service regarding the general sources of funds for the "Indian moneys, proceeds of labor" (IMPL) trust fund accounts, concluded that judgment funds such as that constituted in the Southern Pauite settlement were not included under the IMPL trust fund category:

It is clear that this provision dealt only with a narrow range of "Indian moneys," and not with all funds that might be so described. It is equally clear that funds appropriated in settlement of claims brought before the Indian Claims Commission are not within that narrow range. It follows that this section provides no basis for concluding that the judgment proceeds were held in trust at the time they were distributed by the Secretary.

*Whiskers,* 600 F.2d at 1336–37.

The court does not disagree with the specific finding of the Court of Appeals for the Tenth Circuit that judgment funds appropriated in settlement of claims brought before the Indian Claims Commission are not included within 31 U.S.C. § 1321(a)(20). The fact that judgment funds such as the ones created by the appropriation for the Southern Paiute Nation settlement and the Pembina Awards do not appear to have been classified under the "Indian moneys, proceeds of labor" designation, however, does not end the inquiry. There are ninety-one different subsections of § 1321(a), almost all of which appear to include multiple individual fund accounts. *See* 31 U.S.C. § 1321(a)(1)(91).

8. The purpose of the Permanent Appropriation Repeal Act (PAR Act), as stated in its title, was to "provid[e] that permanent appropriations be subject to annual consideration and appropriation by Congress." The historical context of the PAR Act is that of the Great Depression. The control of substantial budgetary resources by executive agencies through permanent appropriations was seen as defeating the objective of congressional oversight of the purse strings. *See* H.R.Rep. No. 73–1414, at 1 (1934) (to accompany H.R. 9410) ("It is maintained that neither by ethics, by logic, nor by constitutional authority has any one Congress the right to bind the hands of posterity by the enactment of laws mandatorily calling for automatic withdrawals from the Federal Treasury without annual examination, approval, and supervision of succeeding Congresses."). The chairman of the House Subcommittee on Permanent Appropriations, the body charged with drafting H.R. 9410 (enacted as the PAR Act), addressed this concern before the full House during the session in which the bill was passed by unanimous vote: "It is the conclusion of the committee, after hearing numerous witnesses, that permanent appropriations are a vicious usurpation and invasion of the rights of sitting Congresses ...." H.R. 9410, 73d Cong., 78

Cong. Rec. 8236, 8241 (1934) (statement of Representative Anthony Griffin).

The committee's undertaking was no small feat: the reform measure addressed over 370 pieces of legislation establishing permanent appropriations amounting to a total of over $2.3 billion in fiscal year 1935. *Id.* at 8246. The effect of the legislation was greatly to reduce the number of permanent appropriations and to require that executive agencies submit annual appropriations for congressional review. According to one member of Congress, "the bill stops 367 back-door appropriations that for 135 years have been going out of the back door of the Treasury of the United States without any accounting [at] all to the Congress.... [With passage of the bill, w]e are not going to turn over hundreds of millions of dollars to some Cabinet officer who will arrogantly snap his fingers at Congress, and ignore the wishes of Congress, but we are going to know when, how, and where it is going to be spent." *Id.* at 8245 (statement of Mr. Blanton).

9. This subsection was recodified at 31 U.S.C. § 1321(a)(20) by Pub.L. No. 97–258, 96 Stat. 877, 920 (1982).

**3. Notwithstanding *Whiskers,* the Permanent Appropriation Repeal Act of 1934 Classifies the Pembina Awards as Trust Funds**

■ The court finds that judgment funds, even if not included within 31 U.S.C. § 1321(a)(20) as determined by the *Whiskers* court, are in fact included in 31 U.S.C. § 1321(a)(67) under the designation "Miscellaneous trust funds of Indian tribes." *See* 31 U.S.C. § 1321(a)(67) (2000). Both the structure of the PAR Act [10] and its legislative history make it clear that Congress viewed judgment funds such as the Pembina Awards to be and, historically, to have been, trust funds belonging to the tribes. *See Cheyenne–Arapaho Tribes,* 512 F.2d at 1392 ("It is clear from past opinions of this court and of the Supreme Court, and from the actions of both Congress and the Executive Branch, that funds appropriated to Indians to satisfy judgments of the Indian Claims Commission or of this court ... are, when kept in the Treasury, held in trust for the Indians."); *see also Loudner,* 108 F.3d at 900–01 (noting the presumption of trust status for Indian moneys held by the government and finding that because "the government points to no statutory language relieving it of these long-established obligations ... we must judge its conduct 'by the most exacting fiduciary standards' ") (quoting *Seminole Nation v. United States,* 316 U.S. 286, 297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942)); *Rogers,* 697 F.2d at 890 (noting that "for a century and a half, the Supreme Court has characterized the relation of the United States to the Indian nations as a unique trust obligation" and that "there is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust") (citing *Moose,* 674 F.2d at 1281).

Section 1321(b)(1) provides the explicit recognition of the trust character of funds enumerated under § 1321(a) and states, in pertinent part:

Amounts ... that are analogous to the funds named in subsection (a) of this section and are received by the United States Government as trustee shall be deposited in an appropriate trust fund account in the Treasury. Except as provided in paragraph (2), amounts accruing to these funds are appropriated to be disbursed in compliance with the terms of the trust.

31 U.S.C. § 1321(b)(1).[11] The funds listed under this section are declared by Congress to be trust funds and amounts accruing to these funds are defined by the statute as "appropriated," thereby eliminating the need for separate annual appropriations prior to disbursement. The provision that trust funds are "to be disbursed in compliance with the terms of the trust" addresses concerns that executive agencies had expressed regarding the availability of deposited moneys to fulfill trust purposes. *See, e.g.,* S.Rep. No. 73–1195, at 27 (1934) (Letter of Harold Ickes, Secretary of the Interior) ("I have no objections to the provisions of H.R. 9410 provided deficiencies will be permitted to pay interest on Indian trust funds and individual payments to Sioux Indians ... and collections from water users are appropriated for use rather than used to increase the general fund of the Treasury.").

The terms of the PAR Act therefore recognized and carried out the fiduciary responsibilities of the government toward funds it held in trust, while also reforming the appropriations system for moneys belonging to the government. These distinct functions of the PAR Act were expressly delineated in the classification of receipts described by the House Subcommittee on Appropriations in developing the legislation that became the PAR Act:

The immediate problem confronting the committee in resolving its judgment on the various items of appropriation upon which hearings were conducted was largely one

---

**10.** Funds with their own independent sources of revenue that did not depend on annual appropriations from the Treasury were classed together under § 20 of the PAR Act and included both IMPL trust funds derived largely from tribal mineral and forest resources and the miscellaneous trust funds created from the sale of Indian trust

lands, settlements, and other nonrecurring sources. *See* H.R.Rep. No. 73–1414, at 12.

**11.** The exception referenced in the last sentence of the provision applies to four military trust funds that require annual appropriations. *See* 31 U.S.C. § 1321(b)(2).

of classification. As a primary thesis there are, essentially, but two forms of government receipts, (1) those accruing to the Government, in its sovereign capacity, as a result of law, and (2) those accruing to the Government as a trustee of moneys belonging to individuals, either in consequence of law or as a result of the factual relationship existing between the Government and such individuals. Thus, in the instance of the former, the moneys belong to the Government; in the case of the latter, they belong to the individual. To further classify or subclassify such receipts, in the mind of the committee, can but serve to confuse the issue and to make extremely difficult of comprehension a subject that otherwise is easily understandable.

H.R.Rep. No. 73–1414, at 3. A clear distinction between funds owned by the government and funds held by the government in trust for their rightful owners was reflected in the structure of H.R. 9410 and adopted with the enactment of the PAR Act. While attending to what Congress saw as its constitutional duty to appropriate moneys held by the Treasury, the framers of H.R. 9410 provided a flexible mechanism in § 20 of the PAR Act for safeguarding the trust character of those funds then held in trust by government as well as funds thereafter to be so held. The House Report further described the drafting process of collecting in one place (that is, in § 20 of the PAR Act) a list of "all funds of a trust nature."

Once moneys are covered into the Treasury, regardless of the nomenclature that may be applied to the account in which they are deposited, they are bound by the constitutional inhibition that "No money shall be drawn from the Treasury but in consequence of appropriations made by law." . . .

In keeping with this thought, the committee applied itself to the task of listing in subsection (b) of this section, all funds of a trust nature appearing on the books of the Government. It is quite possible that some accounts that should have been included in the list have been inadvertently omitted. If so, it will not be a difficult matter for the particular department, bureau, or official, administering such an account, if of a character anal[o]gous to those named in this section, to have it established as a trust fund for which appropriation is made by the terms of this act.

H.R.Rep. No. 73–1414, at 12. "All funds of a trust nature" were included under § 20 of the PAR Act and this section was to remain open for the inclusion of future funds "of a character analog[o]us to those named in this section." *Id.* Congress justified its decision to embed a section recognizing a large group of permanent appropriations in legislation whose stated purpose was to repeal "such portions of any Acts as provide permanent or continuing appropriations from the general fund of the Treasury," PAR Act pmbl., at 1224, on the basis of the trust character of the funds in question. The House Report made two points: first, Congress intended that all current trust funds, and future funds of similar character, were to be included under the provisions of § 20. H.R.Rep. No. 73–1414, at 12. Second, despite the determination of Congress to repeal all permanent appropriations, *see* 78 Cong. Rec. at 8241–43, the accounts in § 20 are allowed to retain their character as permanent because the trust funds concerned are not Government money, H.R.Rep. No. 73–1414, at 12. The House Report states:

In order to close the question as to the right of the Comptroller General to approve withdrawals of trust-fund moneys without actual appropriation thereof of Congress, language has been inserted in this section appropriating the moneys in the trust funds listed in this section as well as in trust funds of similar character established in the future. While this is in fact a permanent appropriation in itself, it appears to be the most effective way of meeting the problem, and is entirely justifiable on the ground that the moneys are not *Government* moneys, and in no way enter into the fiscal program of the Government, and follows the policy heretofore employed as to all trust funds.

*Id.* Congress therefore considered trust funds "appropriated" at the time of deposit and directed that such funds were to be disbursed according to the terms of each

trust. 31 U.S.C. § 1321(b)(1) ("amounts accruing to these funds are appropriated to be disbursed in compliance with the terms of the trust").

Funds carried in accounts referenced in 31 U.S.C. § 1321(a)(67) as "Miscellaneous trust funds of Indian tribes" were described by the Secretary of the Interior as "accru[ing] mainly from sales of surplus tribal Indian lands and timber; oil and gas royalties, including bonus on leases, etc. . . ." *Hearing on H.R. 9410 Before the Subcomm. on Permanent Appropriations of the House Comm. on Appropriations*, 73d Cong., 2d Sess., at 267 (1934) (letter from Harold L. Ickes, Sec'y of the Interior) (H.R. 9410 Hearing). The Chief Finance Officer of the Indian Service, Samuel M. Dodd, Jr., elaborated on this description in response to a question from Representative Glover Cary, member of the House Subcommittee on Permanent Appropriations, regarding the deposit into this trust fund of revenues generated from the sale of tribal lands:

> Mr. Dodd. That represents principally the areas that we call "ceded areas" on the reservations, where the land is sold under reservations of the General Land Office, but the money is deposited to the credit of the tribe.
>
> *There is one other source of revenue that would increase the amount of some of these tribal funds, and that comes from judgments rendered by the Court of Claims.* These tribes feel that they have not obtained all that was due them, perhaps, for some land that had been withdrawn, for which they were compensated at the rate of $1.25 per acre. Or they find that some tribal provisions have not been complied with, and they seek a jurisdictional bill from Congress, and the Court of Claims hears the case and makes an award.
>
> There was a case a couple of years ago where something more than $2,000,000 was awarded to the Fort Berthold Indians. Congress, by direct appropriation, took care of the claims of the Utes in Utah.
>
> Mr. Cary. How is this per capita arrived at? Is that a distribution from the pro-

ceeds of the tribe's income, distributed per capita among the members of the tribe? Mr. Dodd. Yes, sir. In some cases it is based on an old roll. . . . In other cases, it provides for the distribution to the Indians living on certain dates. We get authorizations through Congress to make per capita payments.

H.R 9410 Hearing, at 270 (emphasis added). Chief Finance Officer Dodd specifically included funds awarded in judgments rendered by the Court of Claims in his explanation of "trust funds" under this subsection. He also included funds allocated for per capita distribution-as are the Pembina Awards in the present case-under this account heading as funds belonging to the Indian tribes and held in trust by government.

In the excerpt of the hearing quoted above, Mr. Dodd refers to an award to the Fort Berthold Indians. The case referred to is *Indians of the Fort Berthold Indian Reservation in the State of North Dakota v. United States*, 71 Ct.Cl. 308, 1930 WL 2473 (1930), and, as Mr. Dodd indicated, involves a judgment fund classified under 31 U.S.C. § 1321(a)(67), "Miscellaneous trust funds of Indian tribes." The statute appropriating the funds awarded by the Court of Claims provided for the withdrawal of funds from the Treasury and called for a pro rata distribution to all eligible members of the plaintiff tribes, "under such rules and regulations that [the Secretary of the Interior] may prescribe . . . ." S.J. Res. 226, 71st Cong., 46 Stat. 1481 (1931). Neither the decision of the court in the *Fort Berthold* case nor the Joint Resolution authorizing the appropriation and distribution of the judgment funds, S.J. Res. 226, characterized the resulting award as a "trust fund" or as funds "held in trust" by the government. Nevertheless, the understanding of the government, as explained to Congress by the Chief Finance Officer of the Indian Service, was that judgment funds were classified as trust funds. H.R. 9410 Hearing, at 270. It is this understanding that was enacted in the Permanent Appropriations Repeal Act of 1934.

From the foregoing, the court concludes that funds such as the Pembina Awards appropriated to satisfy judgments of the Court

of Claims and deposited in the Treasury to the credit of Indian tribes are "trust funds" under the provisions of 31 U.S.C. § 1321(a)(67).

### 4. Classification by Treasury of the Pembina Awards as Trust Accounts

█ The conclusion that the Pembina Awards were held in trust is further supported by the classification system employed by the Treasury to account for trust and other moneys received by the United States government. Under the Treasury classification system, all appropriated moneys and funds collected by the various departments of government are assigned account numbers that indicate the class of receipt or appropriation. This system is more particularly described in a 1946 Court of Claims opinion addressing a Department of Agriculture trust fund established under § 20 of the PAR Act in a trust account titled "Miscellaneous Contributed Funds, Department of Agriculture." *See King v. United States*, 107 Ct.Cl. 223, 234–37, 68 F.Supp. 206 (1946). The opinion describes the various types of Treasury funds designated by certain "master symbols." *Id.* at 235, 68 F.Supp. 206. In particular, "[m]aster symbols 7000 to 9999 designate 'Trust Funds' . . . ." *Id.*

Pursuant to the provisions of the Budget and Accounting Act, the General Accounting Office prepared and promulgated a general system for designating accounts by symbol numbers. . . . All Departments of the Government are required to account for all appropriated monies and collections coming into their custody in accordance with the terms of these regulations.

Under [this] system . . ., the master symbols from 0001 to 5999 designate what it termed "General Funds" of the United States . . . . Master symbols 6000 to 6999 designate "Special Funds," which are prescribed for the particular type of disbursement designated by Congress at the time legislation is passed authorizing the collection of funds for such purpose, but not under a trust arrangement.

Master symbols 7000 to 9999 designate "Trust Funds," which represent moneys received by the United States for the purposes specified in and for disbursement in accordance with the terms of the arrangements under which they are accepted.

*King*, 107 Ct.Cl. at 234–35. Treasury assigned account nos. 14x9012 and 14x9512 to the funds deposited from the 1964 Award. With respect to the two appropriations for the 1980 Award, Treasury assigned account nos. 14x9244, 14x9744, and 14x9172, 14x9672, respectively.[12] The numerical code "14" identifies the Department of the Interior,[13] while the letter "x" denotes that the appropriation is ongoing and without a fiscal year limitation under the authority of the PAR Act. *King*, 107 Ct.Cl. at 236. A graphic presentation of the structure of the accounts established for the Pembina Awards is provided in a chart contained in Exhibits to Defendant's Opposition to Plaintiffs' Renewed Motion for Class Certification, Ex. 5 at 12A. In the chart, defendant records the account numbers for the three appropriations constituting the Pembina Awards and the account numbers of the five accounts established for the beneficiary tribes and the group of lineal descendants under the 1982 Distribution Act. *Id.* All of the account numbers are in the 7000 to 9999 range reserved for trust fund accounts. *Id.* This evidence further supports the court's view that the Pembina Awards held by the Treasury are held as trust funds.

12. *See* [Defendant's] Exhibits to Consolidated Opposition to Plaintiffs' Amended Motion for Class Certification, and to Plaintiff[s]' Motion for Ruling on Joinder of Parties Issue and Parens Patriae Issue Before Consideration of Class Certification (Def.'s Consol. Opp. Exs.), Exhibit (Ex.) 5, Docket No. 115A, March 13, 2003 (Exhibit 5). Exhibit 5 includes a Memorandum Audit Report issued by the Office of Inspector General, Dep't of Interior, that lists the account numbers for the 1964 and 1980 Awards in a table titled Pembina Chippewa Judgment Award Funds. *See* Exhibit 5, Memorandum Audit Report: Review of Pembina Chippewa Judgment Trust Funds, Report No. 89–52, March 1989, at 4.

13. *See* Financial Management Services, FAST Book, Treasury Financial Manual, Supp. to Vol. 1, Part IV, Indices to Appropriations and Other Fund Account Symbols and Titles, (Nov.2005) *available at* http://www.fms.treas.gov/fastbook/fb-numindex .pdf (last visited Jan. 20, 2006).

5. The 1982 Distribution Act Does Not Negate the Trust Character of the Pembina Awards

Defendant argues that two provisions in the 1982 Distribution Act that include trust language are evidence that the Pembina Awards were not held in trust between the time appropriated and the time of distribution. Def.'s Cross–MSJ Reply at 12 ("If Congress was acting under the presumption that the [Pembina Judgment Fund (PJF)] monies automatically became funds held 'in trust,' . . . all of the language specifically designating the Tribal program funds as monies held in trust would be superfluous."). The first provision, repeated in almost identical language for each tribe or band in § 3 though § 6 of the 1982 Distribution Act, provides for the distribution of 80% of the 1980 award on a per capita basis and the remaining 20% to a tribal trust fund:

> (1) Eighty per centum of such funds shall be distributed in the form of per capita payments (in sums as equal as possible) to all enrolled members of the Turtle Mountain Band of Chippewa Indians who are living on the date of the enactment of this Act.
>
> (2) *Twenty per centum of such funds shall be held in trust and invested by the Secretary for the benefit of the members of the Turtle Mountain Band of Chippewa Indians.* The governing body of such band is authorized to use the interest and investment income accrued on such 20 per centum p[or]tion, on an annual budgetary basis subject to the approval of the Secretary, for . . . .

1982 Distribution Act § 3 (emphasis added). The second provision cited by defendant, *see* Def.'s Cross–MSJ Mem. at 14 n. 9, is from § 8 of the 1982 Distribution Act and provides for the treatment of any per capita share payable to an incompetent or a minor:

> (c) *Any per capita share of funds to which a legally incompetent individual or an individual under eighteen years of age is entitled under this Act shall be paid in accordance with such procedures (includ-*

*ing an establishment of trusts*) *as the Secretary determines to be necessary to protect and preserve the interests of such individual.*

*Id.* § 8 (emphasis added).

The court does not find that the foregoing provisions negate the existence of a trust from the date of appropriation of the Pembina Awards until distribution. The court believes that a more natural reading of the 1982 Distribution Act begins with a review of its stated purpose, namely, "to provide for the use and distribution of funds awarded the Pembina Chippewa Indians." 1982 Distribution Act pmbl. The beneficiary tribes chose to retain 20% of each tribe's portion of the 1980 Award for social and economic programming, tribal administration, or other purposes as determined by the governing body of the tribe.[14] 1982 Distribution Act § 3. The retained funds did not go directly to the tribes but remained in the Treasury and could be accessed only through annual plans submitted by the governing body of the tribe or band and approved by the Secretary of the Interior. *Id.* §§ 3(2), 4(2), 5(2), 6(2). While the funds distributed to individual beneficiaries lost their trust status upon distribution, the 20% of funds remaining in the Treasury for annual programming did not lose their trust character but continued to be "held in trust and invested by the Secretary" for the tribe's benefit. The reference in § 8(c) of the 1982 Distribution Act to the establishment of trusts for minors or other legally incompetent beneficiaries "as the Secretary determines to be necessary" for their protection, merely authorizes the possible creation-separate from the the tribal trust fund in which the 20% retained portion of the 1980 Award would be held-of individual trust accounts which could be used to protect and make productive the per capita share of a minor or otherwise incompetent beneficiary. The provisions are forward-looking. The court does not perceive how the trust provisions of the 1982 Distribution Act could negate the existence of trust obligations prior to the date of distribution.

---

**14.** This percentage corresponds to the minimum to be retained for tribal programming under section 3(B)(5) of the Indian Tribal Judgment Funds Use and Distribution Act (IJFDA), Pub.L. No. 93–134, 87 Stat. 466, 467 (1973).

Not only does the language of the 1982 Distribution Act not support defendant's view that the Pembina Awards were not held in trust prior to distribution, but language in both distribution acts clearly contemplates that the funds appropriated for both the 1964 Award and the 1980 Award would have earned interest, as would be the case if the Pembina Awards were trust funds. The 1971 Distribution Act for the 1964 Award provided for the distribution of the appropriated funds, "together with the interest thereon," after payment of expenses including those attendant to carrying out the distribution plan, attorney fees, and litigation expenses. *See* 25 U.S.C. § 1241.

The funds appropriated by the Act of June 9, 1964 (78 Stat. 204, 213), to pay a judgment to the Pembina Band of Chippewa Indians in Indian Claims Commission dockets numbered 18–A, 113, and 191, *together with the interest thereon*, after payment of attorney fees and litigation expenses, and such expenses as may be necessary in carrying out the provisions of this Act, shall be distributed as provided therein.

1971 Distribution Act, 25 U.S.C. § 1241 (emphasis added). This provision distinguishes the total fund—the funds appropriated plus "the interest thereon"—from expenditures to be deducted prior to the distribution, namely, attorney fees, litigation costs, and the costs of implementing the distribution plan.

In the 1982 Distribution Act, Congress was even more explicit in its contemplation that the distribution of the 1980 Award would encompass income earned from the productive investment of the 1980 Award: "All of the funds appropriated with respect to the judgment awarded the Pembina Chippewa Indians in dockets 113, 191, 221, and 246 (less attorney fees and litigation expenses), *including all interest and investment income accrued*, shall be divided by the Secretary of the Interior ...." 1982 Distribution Act § 2 (emphasis added). As with the

words "together with the interest thereon" in the 1971 Distribution Act, the directive to include "all interest and investment income accrued" in the 1982 Distribution Act cannot be ignored as surplusage without negating the intent of Congress in making such an express provision. *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect if possible, to every clause and word of a statute ....' "); 2A Norman J. Singer, *[Sutherland] Statutes and Statutory Construction* § 46:06, at 181–90 (6th ed. 2000) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ....").

The court sees nothing in the provisions of the 1982 Distribution Act which is inconsistent with either the language of 31 U.S.C. § 1321 or the government's classification of the Treasury accounts created to receive the Pembina Awards. Both 31 U.S.C. § 1321 and the government's treatment of the Pembina Awards make it clear that the Pembina Awards were held as trust funds.

6. Office of Management and Budget Interpretation of the Government's Trust Obligations With Respect to Indian Trust Funds

The fiduciary nature of the government's obligations with respect to Indian trust funds was recognized by the Office of Management and Budget (OMB) in a 1997 Notice of Interpretation (Interpretation) [15] regarding the reporting of information on Indian trust funds in the financial reports of the Department of the Interior. *See* Interpretation Numbers 1 and 2 Related to Statement of Federal Financial Accounting Standards Numbers 4, 5, and 7, 62 Fed.Reg. 11505 (March 12, 1997). The Interpretation notes that "[i]n customary usage, the term 'trust fund' refers to money belonging to one party and held 'in trust' by another party operating as a fiduciary." 62

---

**15.** An Interpretation is a statement clarifying the meaning of a concept, standard or other administrative guidance issued by the Federal Accounting Standards Advisory Board. *See* Interpretation Numbers 1 and 2 Related to Statement of Federal Financial Accounting Standards Num-

bers 4, 5, and 7, 62 Fed.Reg. 11505 (March 12, 1997). A Notice of Interpretation is published in the Federal Register following adoption of the Interpretation by the Office of Management and Budget. *Id.*

Fed.Reg. at 11506, ¶ 6 (quoting Statement of Federal Financial Accounting Concepts (SFFAC) No. 2). OMB adopted the SFFAC finding that Indian funds held by the Department of Interior are "true" trust funds in the customary sense:

> Indian trust funds are "true" trust funds in the customary sense, in which *there is a legal fiduciary relationship between the Federal Government as trustee and the Indians as trustor.* The Federal Government does not own the assets of the funds. In some cases, the Federal Government's trustee relationship is with individuals, in other cases with tribes. For many of the funds involved, a tribe or individual can use the funds or dissolve the trust at any time; however, *there is a restriction on the use of funds that have been received through legal judgments.* Those funds generally are not available until the beneficiaries agree how the funds are to be distributed among them.

62 Fed.Reg. at 11506, ¶ 7 (emphasis added). The Interpretation was the product of an agreement among the General Accounting Office, the Department of the Treasury, and the Office of Management and Budget in the Executive Office of the President. *Id.* at 11505. Once adopted by OMB, it was "published in the Federal Register and distributed throughout the Federal Government." *Id.* The "legal fiduciary relationship" applies to all Indian trust funds, but the Indian beneficiaries are particularly reliant on the good faith and prudent performance of the fiduciary in the case of trust funds arising from legal judgments because of constraints on the availability and use of judgment funds. *See id.* at 11506, ¶ 7.

### 7. Conclusion

Both the intent of Congress expressed in 31 U.S.C. § 1321 and long executive branch practice support the conclusion that "funds appropriated to Indians to satisfy judgments of the Indian Claims Commission or of this court ... are, when kept in the Treasury, held in trust for the Indians." *Cheyenne–Arapaho Tribes,* 512 F.2d at 1392.

### C. The Statutory Duty to Invest Trust Funds

■■ Plaintiffs argue that the government failed to execute properly its fiduciary duties in the management of the Pembina Awards from the time the funds were appropriated through the time the funds were distributed and thereafter. *See* Pls.' 2d Am. Compl. at 22–23. Specifically, plaintiffs allege that defendant as trustee (1) failed to invest the Pembina Awards in a timely manner, *id.* at 23, ¶ 67, and (2) failed to invest the Pembina Awards so as to attain the maximum investment returns possible, *id.* ¶ 68. Plaintiffs claim that the government breached its trust obligations under the general investment statutes applied to trust funds, including 25 U.S.C. §§ 161, 161a and 162a, and that the damages plaintiffs have suffered due to the alleged breaches of fiduciary duties are compensable. *See* Pls.' Inv. MSJ Mem. at 21–25.

The statutes that govern the investment of funds held in trust by the government also "define the contours of the United States' fiduciary responsibilities." *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961; *see also Pawnee v. United States,* 830 F.2d 187, 192 (Fed.Cir. 1987) (finding that "the fiduciary relationship springs from the statutes and regulations which 'define the contours of the United States' fiduciary responsibilities'") (quoting *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961). The investment statutes of most importance to plaintiffs' claims, 25 U.S.C. §§ 161a and 162a, represent two generally distinct paths in legislation governing the treatment of Indian trust funds, one involving funds maintained by the trustee in Treasury accounts and the other concerning trust funds removed from the Treasury and placed by the trustee in other investments.

### 1. Trust Funds Held in Treasury Accounts

Prior to 1880, the treatment of tribal funds held by the government was inconsistent, depending largely on treaty provisions and tribe-specific statutes. *See* Pls.' Inv. MSJ Mem. at 22. With the passage of the Act of April 1, 1880, 21 Stat. 70 (codified at 25 U.S.C. § 161 (2000)), Congress authorized the deposit of trust funds into Treasury ac-

counts and provided for the payment of interest on the deposits:

> The Secretary of the Interior is authorized to deposit, in the Treasury of the United States, any and all sums held by him on April 1, 1880, or which may be received by him, *as Secretary of the Interior and trustee* of various Indian tribes, ... *whenever he is of the opinion that the best interests of the Indians will be promoted by such deposits, in lieu of investments;* and the United States shall pay interest semiannually, from the date of deposit of any and all such sums in the United States Treasury, at the rate per annum stipulated by treaties or prescribed by law, and such payments shall be made in the usual manner, as each may become due, without further appropriation by Congress.

25 U.S.C. § 161 (emphasis added).[16] This statute makes two points of particular importance to an understanding of the intent of Congress in regard to Indian trust funds. First, the Secretary of the Interior, acting as trustee of the tribes, was to act in "the best interests of the Indians" in his management of Indian moneys. Second, Congress intended that trust funds increase in value while under the government's care—either through investment in government bonds or securities or by placement in interest-bearing Treasury accounts. *See* 25 U.S.C. § 161 ("The Secretary of the Interior is authorized to deposit, in the Treasury of the United States, any and all sums held by him ... as ... trustee of various Indian tribes ... whenever he is of the opinion that the best interests of the

Indians will be promoted by such deposits, in lieu of investments ...."). However, Congress had not at that time provided a statutory rate of interest to apply to trust funds in cases where a rate of interest was not stipulated in the relevant treaty or appropriation act.

The failure to provide a statutory rate of interest in 25 U.S.C. § 161 led to discrepancies in productivity among Indian funds held in trust in the Treasury.[17] This discrepancy was rectified by Congress by enactment of the Act of February 12, 1929, ch. 178, § 1, 45 Stat. 1164 (codified as amended at 25 U.S.C. § 161a (1982))[18], which provided that if no interest rate is specified, all Indian trust funds greater than $500 would be invested at an annual interest rate of 4 percent:

> All funds with account balances exceeding $500 *held in trust by the United States* and carried in principal accounts on the books of the Treasury Department *to the credit of Indian tribes,* upon which interest is not otherwise authorized by law, shall bear simple interest at the rate of 4 per centum per annum.

25 U.S.C. § 161a (1982) (emphasis added). The express language used by Congress makes the determining factors for applying the interest provision of § 161a whether the funds are "held in trust by the United States" and whether the funds are held "to the credit of Indian tribes." *See* Def.'s Cross–MSJ Reply at 10 (emphasizing the importance of the language used in § 161a prior to the 1984 amendment). The accounts established for the Pembina Awards are all

---

**16.** The provision that interest would be paid "without further appropriation by Congress" was repealed by § 2 of the Permanent Appropriation Repeal Act of 1934 and made subject to annual appropriation. PAR Act, ch. 756, § 2, 48 Stat. at 1225 (codified at 31 U.S.C. § 725a) (eliminated 1982). The annual appropriations were to be authorized "in identical terms and in such amounts as now provided by the laws providing such permanent appropriations ...." *Id.*

**17.** The Chief Finance Officer of the Indian Service, the predecessor institution to the Bureau of Indian Affairs, explained that interest rates on Indian trust funds varied among

> "three, four, and five percent" ... and it was found in a number of cases these [treaties and acts of Congress] did not provide for the payment of interest. So that we had the situation

where one tribe had vast revenues in the Treasury that were drawing interest, whereas another tribe had as much or more, and no interest was paid. So, by the act of February 12, 1929 (45 Stat. 1164), Congress directed that all money in excess of $500 held by the United States in a trust fund account should be paid simple interest at the rate of four percent per annum.

*H.R. 9410 Hearing,* at 268 (statement of Mr. Dodd).

**18.** This section was amended by the Act of June 13, 1930, ch. 483, 46 Stat. 584. The codification provided in the 1982 edition of the United States Code cited here was again amended in 1984, as discussed *infra.*

classified in the 7000–9999 series [19] reserved by Treasury for trust fund accounts. *See King*, 107 Ct.Cl. at 235, 68 F.Supp. 206. After the enactment of 25 U.S.C. § 161a, interest was paid on all Indian trust funds greater than $500 held by the government in the Treasury.

In 1984, the wording of § 161a was amended to provide greater flexibility to the government as trustee to invest Indian trust funds-with the apparent intent that the funds would receive rates of return comparable to those available on the market for government-backed securities:

> [A]ll funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior, in public debt securities with maturities suitable to the needs of the fund involved, as determined by the Secretary of the Interior, and bearing interest at rates determined by the Secretary of the Treasury, *taking into consideration current market yields on outstanding marketable obligations of the United States* of comparable maturities.

Act of October 4, 1984, Pub.L. No. 98–451, 98 Stat. 1729 (codified as amended at 25 U.S.C. § 161a(a) (2000)) (emphasis added). The purpose of the amendment to § 161a was "to provide authority for the payment of a variable rate of interest on Indian tribal trust funds." H.R.Rep. No. 98–988, at 1 (1984), U.S.Code Cong. & Admin.News 1984, p. 2905. The House Report indicates that interest rates for government securities at the time were around 9½ percent compared with the 4 percent rate set out in the 1929 act. *See id.* at 2. As noted in the House Report, "The average amount of funds subject to section 161a is about $8,000,000. At the 4 percent rate, that amount earns approximately $320,000. At a more current rate of 9½ percent, it would earn $760,000." *Id.*

The House Report included a communication from the Department of the Interior that explained Interior's support for the legislation in the following terms: *"In order for the federal government to better fulfill its trust responsibility to the Indian people* and to make the return on all trust funds more equitable in today's economic climate, Indian trust funds should be provided a more flexible rate of interest. The draft bill would accomplish this ...." *Id.* at 4 (letter from Kenneth Smith, Assistant Sec'y, Indian Affairs) (emphasis added).

### 2. Trust Funds Invested in Other Than Treasury Accounts

The 1880 legislation authorizing the deposit of Indian trust funds into interest-earning Treasury accounts was in part a response to defaults on securities in which trust funds had been invested by the Secretary of the Interior in other than Treasury accounts, as well as declining interest rates in the market. *See Cheyenne–Arapaho Tribes*, 512 F.2d at 1393. Prior to that time, "tribal funds, rather than being deposited in the Treasury, were required by law to be invested, usually at a minimum rate of return of 5%." *Id.* at 1393 (citations omitted). Congress returned to the issue of the active management of Indian investment funds in 1918 with legislation that authorized the Secretary of the Interior to take Indian funds from the Treasury and invest them in banks offering the same or a higher rate than Treasury was required to pay:

> The ... Secretary is also authorized ... to withdraw from the Treasury and deposit in banks ... such common, or community, trust funds ... on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks: *Provided,* That no tribal or individual Indian money shall be deposited in any bank until the bank shall have agreed to pay interest thereon at a reasonable rate and shall have furnished an acceptable bond or collateral security therefor, and United States bonds may be furnished as collateral security for either tribal or individual funds so deposited, in lieu of surety bonds.

Act of May 25, 1918, ch. 86, § 27, 40 Stat. 561, 591 (codified as amended at 25 U.S.C.

---

19. *See supra* note 12 and accompanying text.

§ 162 (1934)). This statute was repealed in 1938 and replaced with provisions that granted authority to the Secretary of the Interior to invest trust funds in banks that offered higher rates than those paid by the Treasury. *See* Act of June 24, 1938, ch. 648, 52 Stat. 1037 (codified as amended at 25 U.S.C. 162a(a) (2000)). The new statute greatly expanded the investment options available for Indian trust funds by including bonds, notes and other obligations offered by public or private institutions, while insuring the security of the funds. *See id.* Section 162(a)(a) provides in pertinent part that

> the Secretary of the Interior, *if he deems it advisable and for the best interest of the Indians,* may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States.

*Id.* (emphasis added). Congress expressed its intent that investments should be made "for the best interest of the Indians" and insured the security of the investments by restricting them to those unconditionally backed by the United States. During its deliberations over the legislation leading to the 1984 revision of 25 U.S.C. § 161a, Congress expressed its view that investment under § 162a was the preferred method for insuring the productivity of trust funds when market conditions allowed rates of return superior to the mandatory floor interest rate of 4% then provided by the Treasury under § 161a. *See* H.R.Rep. No. 98–988, at 1–2. The House Report explains that holding trust funds in the Treasury was meant to be an interim measure:

> Under normal circumstances, Indian trust funds are invested under authority of 25 U.S.C. § 162a. This authority permits the Secretary of the Interior to invest such funds, at market rates, either in obligations of federally insured banks or through direct purchase of U.S. securities. 25 U.S.C. § 161a is stop-gap authority, permitting the payment of interest on such funds in the U.S. Treasury prior to investment under 25 U.S.C. § 162a or during float periods.

*Id.* at 1–2. While acknowledging that the preferred investment vehicle for trust funds was 25 U.S.C. § 162a, Congress also revised § 161a to make trust funds held in the Treasury more productive during the interim periods when not invested under the authority of § 162a. As the Congressional Budget Office noted in its report on the legislation that revised § 161a, "[e]nactment of this bill would require the Secretary of the Treasury to pay a higher interest rate than the 4 percent now required for funds the Treasury holds in trust for some Indian tribes." H.R.Rep. No. 98–988, at 3, U.S.Code Cong. & Admin.News 1984, p. 2907.

The history of investment-related legislation indicates a congressional commitment to increasing the productivity of Indian funds held in trust by the government. For trust funds held in Treasury accounts, Congress began by authorizing the deposit of trust funds in interest-bearing Treasury accounts (the 1880 enactment of 25 U.S.C. § 161 allowing interest to be paid on Treasury deposits), then mandated that all Indian trust funds held in Treasury accounts receive a floor interest rate of 4% unless otherwise provided by treaty or statute (the 1929 passage of § 161a making the payment of interest mandatory), and finally provided for variable interest rates that reflected current market yields for Indian trust funds held in Treasury accounts (the 1984 revision of § 161a(a) providing for the payment of variable interest rates on trust funds). Prior to 1880, Congress had also provided for the placement of trust funds in investments other than interest-bearing Treasury accounts that allowed the funds to attract more favorable market rates, but the risks involved led to the enactment of 25 U.S.C. § 161. Yet the importance of seeking higher market-based yields prompted further legislation (the 1918 enactment of 25 U.S.C. § 162) that allowed for the investment of Indian trust funds outside of the Treasury in banks that offered adequate security, and even further legislation (the 1938 repeal of § 162 and replacement with § 162(a)) that permitted the use of "unconditionally guaranteed" investment vehicles including notes, bonds and other obligations.

3. Investment of the Pembina Awards

Plaintiffs argue that, since their enactment in 1974, the regulations implementing the Indian Tribal Judgment Funds Use or Distribution Act of 1973 (IJFDA), Pub.L. No. 93–134, 87 Stat. 466, "have required Judgment Funds to be invested under the more aggressive Section 162a(a)." Pls.' Inv. MSJ Mem. at 25. Plaintiffs contend that 25 C.F.R. § 60.11 (recodified at 25 C.F.R. § 87.11 in 1982), providing that judgment funds are to be invested under 25 U.S.C. § 162a "[i]n effect ... eliminates the discretion of the Interior Department under 25 U.S.C. § 161 to choose between investing judgment funds and depositing them with the U.S. Treasury." Pls.' Inv. MSJ Mem. at 27 (emphasis omitted). The Department of Interior's regulations governing the IJFDA provide that judgment funds are to be deposited "as soon as possible" after appropriation, that investment shall continue pending approval of a distribution plan or legislation, and that both the judgment funds and the income derived from their investment will continue to be invested while the funds are under the care of the government:

> *As soon as possible after the appropriation* of judgment funds *and pending approval of a plan or the enactment of legislation* authorizing the use or distribution of the funds, *the Commissioner shall invest such funds pursuant to 25 U.S.C. [§ ] 162a. Investments* of judgment funds and of investment income therefrom *will continue to be made* by the Commissioner [of Indian Affairs] *after the approval of a plan or enactment of use or distribution legislation* to the extent funds remain available for investment under such plan or legislation, and provided that thereafter investments of judgment funds made available for tribal use are not undertaken by the tribe pursuant to authorizing law. Invested judgment funds, including investment income therefrom, shall be withdrawn from investment only as currently needed under approved plans or legislation authorizing the use or distribution of such funds.

25 C.F.R. § 87.11 (2005) (emphasis added). The provisions included in 25 C.F.R. § 87.11 are in line with the commitment expressed in prior legislation, regulations, and agency actions to render Indian trust funds productive through active investment while they are held in trust by the government.

Defendant argues that the 1964 Award and its distribution plan approved in 1971 are expressly excluded from the application of regulations implementing the IJFDA under 25 C.F.R. § 87.2. Def.'s Cross–MSJ Mem. at 15. Section 87.2 provides that "[t]he regulations in this part govern the preparation of proposed plans for the use and distribution ... of all judgment funds awarded from the date of the Act ... and of all funds deriving from judgments entered prior to the date of the Act for which there has been no enabling legislation." 25 C.F.R. § 87.2 (2005). Because the 1971 Distribution Act predated the IJFDA, the court agrees with defendant that the plain language of this section excludes the 1964 Award from the specific requirements of 25 C.F.R. § 87.11 and other regulations promulgated pursuant to the IJFDA. Therefore, the directive under § 87.11 that investment under 25 U.S.C. § 162a is to take place "as soon as possible after the appropriation of judgment funds and pending approval of a plan or the enactment of legislation authorizing the use or distribution of the funds" would not apply to the funds appropriated under the 1964 Award and for which distribution plans were approved in the 1971 Distribution Act.

However, this conclusion does not relieve defendant of the fiduciary duty of investing the 1964 Award in keeping with the terms of prevailing statutes, in this case 25 U.S.C. §§ 161a and 162a, including the latter's instruction that investment decisions are to be made by "the Secretary of the Interior, if he deems it advisable and for the best interest of the Indians." *See* 25 U.S.C. § 162a(a). A failure to invest trust funds promptly upon receipt by the Treasury, or the placement of funds in accounts bearing interest rates well below those available from other properly secured investments, would be difficult to reconcile with the intent of Congress expressed in the 1938 enactment and subsequent amendments to § 162a cited above, or in § 161 enacted in 1880, authorizing the Secretary of the Interior "to deposit, in the

Treasury of the United States, any and all sums held by him ... whenever he is of the opinion that the best interests of the Indians will be promoted by such deposits, in lieu of investments ...." 25 U.S.C. § 161.

Defendant also argues that funds appropriated to satisfy the 1980 Award are exempt from the IJFDA and its governing regulations because of the qualifying language used in the 1982 Distribution Act. Def.'s Cross–MSJ Mem. at 15. The language referred to by defendant is in the preamble of the 1982 Distribution Act and states that

> notwithstanding any provision of the Act of October 19, 1973 (87 Stat. 466; 25 U.S.C. 1401 et seq.), or any other law, regulation, or plan promulgated pursuant thereto, any funds appropriated in satisfaction of a judgment awarded to the Pembina Chippewa Indians in dockets numbered 113, 191, 221, and 246 of the Court of Claims shall be used and distributed as provided in this Act.

1982 Distribution Act pmbl. (emphasis added). Defendant argues that the words "notwithstanding any provision of the Act of October 19, 1973 (87 Stat. 466; 25 U.S.C. 1401 et seq.), or any other law, regulation, or plan promulgated pursuant thereto" in the opening of the 1982 Distribution Act "clearly renders the 1973 Act and its implementing regulations inapplicable." Def.'s Cross–MSJ Mem. at 15. Further, defendant argues, this is the only plausible interpretation in light of the Federal Circuit's interpretation of similar language in *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 364 F.3d 1339, 1349 (Fed.Cir.2004). Def.'s Cross–MSJ Mem. at 15–16. The court disagrees with defendant's reading of the Federal Circuit's holding in *Shoshone* and with defendant's conclusion regarding the effect of applying that holding to the facts of this case.

In *Shoshone,* the court addressed the effect of the words "[n]otwithstanding any other provision of law" used in the Department of the Interior and Related Agencies Appropriations Act (Appropriations Act), Public Law No. 108–7, 117 Stat. 11 (2003), to preclude the operation of the six-year statute of limitations on claims against the United States imposed by 28 U.S.C. § 2501. *Sho-*

*shone,* 364 F.3d at 1344. The limiting language in the Appropriations Act provided:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

*Shoshone,* at 1344 (quoting, with emphasis, Pub.L. No. 108–7, 117 Stat. 11 (2003)). The court determined that "[t]he operative language of the Act is the combination of the phrases '[n]otwithstanding any other provision of law' and the directive that the statute of limitations 'shall not commence to run' on any claim until an accounting is provided from which the Tribes can discern whether any losses occurred which would give rise to a cause of action against the trustee." *Id.* at 1346. The Federal Circuit's interpretation of the limiting language led to that court's conclusion that "[t]he clear intent of the Act is that the statute of limitations will not begin to run on a tribe's claim until an accounting is completed." *Id.* at 1347. The court reasoned that "[t]he introductory phrase '[n]otwithstanding any other provision of law' connotes a legislative intent to displace any other provision of law *that is contrary to the Act,* including 28 U.S.C. § 2501." *Id.* at 1346 (emphasis added).

The court in *Shoshone* found that the six-year statute of limitations for bringing claims against the United States under 28 U.S.C. § 2501 *was contrary to* the deferred accrual period provided by Congress under the Appropriations Act and was therefore displaced by the terms of the Appropriations Act. *Id.* In this case, the operative language in the 1982 Distribution Act is the phrase "notwithstanding any provision of the Act of October 19, 1973 ..., or any other law, regulation or plan promulgated thereto" and the phrase "any funds appropriated ... shall be used and distributed as provided in this Act." Pub.L. No. 97–403 pmbl. Applying the analysis used in *Shoshone,* 364 F.3d at 1346, the

court interprets the introductory phrase "notwithstanding any provision of the Act of October 19, 1973" as expressing a legislative intent to displace those provisions of the IJFDA that are directly contrary to provisions in the 1982 Distribution Act regarding how the appropriated funds are to "be used and distributed."

The investment provisions of 25 C.F.R. § 87.11, however, are in no way contrary to the use and distribution provisions of the 1982 Distribution Act. Rather, the express wording of 25 C.F.R. § 87.11 appears to have been carefully crafted to avoid conflict with a planned use of judgment funds. The regulation provides that judgment funds are to be invested "[a]s soon as possible after the[ir] appropriation ... and pending approval of a plan or the enactment of legislation authorizing the use or distribution of the funds." 25 C.F.R. § 87.11. It also provides that judgment funds and the interest thereon will continue to be invested "to the extent funds remain available for investment under such plan or legislation," *id.*, and that invested judgment funds and interest will remain invested until they are "currently needed under approved plans or legislation authorizing the use or distribution of such funds," *id.*

The investment of Indian trust funds under 25 U.S.C. § 162a, when not needed for an approved program use or for distribution under an approved plan, would likely increase the productivity of judgment funds held by government for the benefit of the Indians-in keeping with the expressed intent of Congress. *See* 25 U.S.C. § 162a(a) (authorizing the Secretary of the Interior to invest trust funds in unconditionally guaranteed public and private bonds, notes and obligations "if he deems it advisable and for the best interest of the Indians"). Further, the only reference to the investment of funds in the 1982 Distribution Act calls for the investment of the twenty percent of the funds reserved for tribal programs while it is held in trust by the government. *See* Def.'s Cross–MSJ Mem. at 13 n. 8. This provision is in keeping with the investment requirements found in 25 C.F.R. § 87.11. Based on the foregoing, the court concludes that 25 C.F.R. § 87.11 is not contrary to the provisions of the 1982 Distribution Act providing for the "use and distribution" of the 1980 Award and that the application of 25 C.F.R. § 87.11 is therefore not prohibited by the terms of the 1982 Distribution Act.

Based on the foregoing review of the history of the creation, use and distribution of the Pembina Awards and the statutory basis and legislative history of laws governing the investment of funds held in trust by the United States for the benefit of Indians, the court finds that the funds appropriated by Congress under the 1964 Award and the 1980 Award and deposited to the credit of the tribes with the Treasury were trust funds as defined under 31 U.S.C. § 1321. The executive branch has been charged by Congress with a fiduciary responsibility for the productive investment of funds held in trust for the Indians through the enactment and amendment of investment statutes that create specific fiduciary duties. A breach of those fiduciary duties gives rise to a Tucker Act claim for damages. *See Shoshone,* 364 F.3d at 1354 (finding a "definitive requirement" that the government earn interest on trust funds and citing 25 U.S.C. §§ 161a and 162(a)).

Plaintiffs' motion for summary judgment on the money-mandating character of the investment statutes is GRANTED. Defendant's cross motion for partial summary judgment as to the duty of the government to invest funds appropriated under the 1964 and 1980 Awards is DENIED. While the court finds, under the authority of *Shoshone,* a "definitive requirement" that the government make Indian trust funds productive, the exact contours of that duty under the applicable statutes remain to be determined. The court adopts neither the plaintiffs' argument that the trustee has a duty to obtain "the maximum investment return possible," Pls.' 2d Am. Class Compl. at 23, ¶ 68, nor defendant's arguments that the government has met its obligations as long as "it had a rational basis for its actions," Def.'s Cross–MSJ Mem. at 24, and "did not abuse its discretion by investing outside the statutorily sanctioned options," *id.* at 25.

D. The Statute of Limitations

█ The governing statute of limitations for plaintiff's claims, 28 U.S.C. § 2501, bars a

claim brought more than six years after its date of accrual. 28 U.S.C. § 2501 (1994) ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). Congress has defined the time when certain Indian trust claims "first accrue[ ]" in a series of appropriations acts beginning in 1990 and continuing to the present (collectively, Appropriations Acts) (discussed in part II.C just above in connection with the interpretation of a provision of the 1982 Distribution Act). The portion of the Consolidated Appropriations Acts of 2005, Pub.L. No. 108–447, 118 Stat. 2809 (2004), pertinent to the statute of limitations issue in this case provides that

> notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

*Id.* at 3060–61. The United States Court of Appeals for the Federal Circuit construed the language of the Appropriations Acts in a case involving allegations of a failure by the trustee to collect trust funds due the plaintiff tribe from sand and gravel leases. *Shoshone*, 364 F.3d at 1345–48. In that case, the court found that "[b]y the plain language of the [Appropriations] Acts, Congress has expressly waived its sovereign immunity and deferred the accrual of the Tribes' cause of action until an accounting is provided." *Id.* at 1346. The court noted that, traditionally, a cause of action for breach of trust accrues "when the trustee 'repudiates' the trust and the beneficiary has knowledge of that repudiation." *Id.* at 1348 (citations omitted). The beneficiary may also bring suit as soon as he learns of the breach of fiduciary responsibilities by the trustee. *Id.* Because the trustee can breach his duties without putting the beneficiary on notice of the breach, however, "[i]t is ... common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has oc-

curred that establishes the deficit of the trust." *Id.* (citations omitted).

Defendant moves for dismissal of plaintiffs' claims as time-barred under 28 U.S.C. § 2501, or, in the alternative, for partial summary judgment on the same grounds. Def.'s SOL MTD Mem. at 1. Because the parties have made factual representations going far beyond the pleadings, the court addresses the issue under RCFC 56. *See* RCFC 56(c) (requiring the court grant summary judgment upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

Defendant makes three arguments. First, defendant contends that the tribal plaintiffs received annual and monthly account statements "from the early 1980's forward" that were legally sufficient to provide notice of any losses or of insufficient returns on their accounts. Def.'s SOL MTD Mem. at 23. These reports "included beginning and ending balances, earnings, interest and losses over the period ... [that] told them or allowed them to deduce how Interior was faring in managing their funds ...." *Id.*

In response to defendant's first argument, plaintiffs contend that any financial reports that may have been provided to the tribes during the 1980s and prior to the filing of the complaint were not reliable and did not constitute an accounting that met the audit and account reconciliation requirements of the initial 1987 Appropriations Act, the provision in the Indian 1990 Appropriation Act that an accounting be provided to the tribe or individual, or the requirement of an accounting from which a beneficiary can determine whether there has been a loss enacted in the 1991 and subsequent Appropriations Acts. Pls.' SOL Opp. at 5–7. Plaintiffs contest the legal sufficiency of any notice of mismanagement that defendant's routine financial reports of the 1980s may have provided by citing numerous studies, including reports produced by the United States General Accounting Office and the Department of the Interior's Office of the Inspector General, documenting deficiencies in the trust accounting and management systems then in

place. *Id.* at 16–22 (quoting, for example, a GAO Audit report finding that "Information on the financial status of the trust funds is unreliable. Financial reports are of little value in determining the actual amount of trust funds on hand and, therefore, available for investment." (citation omitted)).

The Federal Circuit's holding in *Shoshone* that a claim will not accrue until a meaningful accounting has been completed and provided to the claimant, 364 F.3d at 1346–47, is applicable to this case:

> The clear intent of the Act is that the statute of limitations will not begin to run on a tribe's claims *until an accounting is completed.* We therefore hold that the Act provides that claims falling within [the Appropriations Acts'] ambit shall not accrue, i.e., "shall not commence to run," *until the claimant is provided with a meaningful accounting.*

*Id.* at 1347 (footnote omitted). The Federal Circuit construed the Appropriations Acts enacted in 1991 and subsequent years to require that a meaningful accounting be completed and provided to the beneficiary that will allow the beneficiary to determine whether any losses to or mismanagement of trust funds have occurred. *Id.* at 1344. The Federal Circuit specifically distinguished the "meaningful accounting" standard from the simple notice standard advanced by defendant, that is, "information sufficient to alert the beneficiary to possible losses." *See* Def.'s SOL MTD Mem. at 18. The *Shoshone* opinion underscored the dependence that a trust beneficiary has on the proper conduct and expertise of the trustee, concluding that "because of this reliance, beneficiaries are under a lesser duty to discover malfeasance relating to their trust assets." *Shoshone*, 364 F.3d at 1347 (citations omitted).

The court reviewed the 34–page sample financial report dated September 30, 1983, provided by defendant. *See* Def.'s SOL MTD Mem., App. G at 45–79. The court does not find the report to be a "meaningful accounting," an assessment confirmed by the difficulty experienced by defendant's counsel during oral argument in deciphering the meaning of the transactions reported, *see* Tr. at 55:12 to 68:8, or even whether the data represented annual or monthly returns, Tr. at 61:19–25 ("I would look at this and I am interpreting this as you are, that you gained $10 thousand over this period, and it says annual, and I would assume over a period [of] a year. It is a little unclear as to whether this was for the period of a month or over a year, but that was the amount earned.") (statement of defendant's counsel). The court does not concur with defendant's assertion that "this information [was] inherently informative," Def.'s SOL MTD Mem. at 25, or that it constituted a "meaningful accounting." *Shoshone*, 364 F.3d at 1347. Defendant acknowledges that financial reports were provided to the tribal plaintiffs only "from the 1980's forward." Def.'s SOL MTD Mem. at 16. Furthermore, there is no indication in the materials submitted to this court that any accounting of the investment performance of the government on trust funds held from 1964 until the time defendant claims reporting commenced was ever provided to the plaintiffs.

The Appropriations Acts expressly referred to the furnishing of "an accounting" which the Federal Circuit in turn emphasized must be "completed" before the statute of limitations would begin to run. *Shoshone*, 364 F.3d at 1347. None of the reports provided by defendant appears to satisfy this requirement.

Second, defendant argues that individual beneficiaries had constructive notice of potential claims by virtue of the per capita distribution of the 1964 and 1980 Awards. Def.'s SOL MTD Mem. at 28 ("Distribution of their shares fixed the government's liability on any potential claim that the PJF was mismanaged, and placed the per capita recipients on constructive notice of any potential claims for mismanagement."). Defendant further argues that with its distribution of the 1964 Award in 1984, and its partial distribution of the 1980 Award to per capita beneficiaries in 1994, "[the Department of the] Interior fully discharged the responsibilities owed to those individual[s] under the 197[1] and 1982 Distribution Acts." *Id.* at 29.

Plaintiffs contest defendant's constructive-notice-by-distribution argument for per capita beneficiaries on the same basis as it con-

tests the unreliability of the reports, and notes that "what [d]efendant proffers as being in the PJF accounts and available for distribution at a particular time is not in and of itself the same as knowledge of whether the proffered amount is, in fact, accurate (*i.e.*, knowledge of what should have been in the accounts had a trustee acted properly)." Pls.' SOL Opp. at 29. Further, plaintiffs argue that the distribution dates did not signal the end of fund accounting and that each account remained open and registered some activity up to and subsequent to the time the complaint was filed. *Id.* at 29–30.

The court finds defendant's argument concerning constructive notice to be unpersuasive because the government relies on the same financial statements that were inadequate to provide notice of losses while all of the funds were still held in trust. The accounting contemplated in the Appropriations Acts would permit beneficiaries to determine whether there has been a loss to the trust. The court does not perceive how the receipt of a per capita distribution would substitute for such an accounting.

Third, defendant argues that distribution of the Pembina Awards terminated any further duty of the trustee to the per capita beneficiaries. Def.'s SOL MTD Mem. at 29 ("Additionally, with the distribution, Interior fully discharged the responsibilities owed to those individual[s] under the 197[1] and 1982 Distribution Acts."). Defendant supports this argument by referring to the "three 'necessary elements['] [of a common-law trust:] 1) a trustee, 2) a beneficiary, and 3) a trust corpus, i.e.[,] funds, land or natural resources held by the trustee." *Id.* (citing *Mitchell II*, 463 U.S. at 225, 103 S.Ct. 2961). Defendant concludes that "with the final distribution ... that third 'necessary' element of a trust corpus no longer existed .... Interior's relationship to those individuals as trustee over their shares of the PJF ended, because there was no longer a trust corpus for it to administer on their behalf." *Id.*

The court understands the government to be arguing that a trustee can avoid liability for malfeasance by handing back whatever is then held in trust and walking away. This is not the law.

Under the Appropriations Acts, trust beneficiaries have a claim for losses caused by mismanagement, nonfeasance or misfeasance on the part of the trustee in violation of statutory duties until a meaningful accounting is provided. *Shoshone*, 364 F.3d at 1347. There is no exception in the Appropriations Acts for cases where, as here, distributions have been made but an accounting has not been presented. Defendant's attempt to avoid liability by arguing that its duty to trust fund beneficiaries terminated with the distribution of the funds is unavailing.

Defendant has failed to show, as required under Rule 56(c), that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." For the foregoing reasons, defendant's motion for dismissal and/or for partial summary judgment based on the statute of limitations is DENIED.

E.  Addition of White Earth Tribe as Plaintiff and Renewed Motion for Class Certification

The tribal Plaintiffs, the Turtle Mountain Band of Chippewa Indians, the Chippewa Cree Tribe of the Rocky Boy's Reservation, and the Little Shell Tribe of Chippewa Indians of Montana, initially brought this action on their own behalf, on behalf of their respective members, and on behalf of "all of the beneficiaries" of the 1964 and 1980 Awards. *See* Compl. at 2–3, ¶¶ 3–5. Plaintiffs also described their suit against defendant as a "Class Action Complaint," *id.* at 1, and argued that tribal plaintiffs "br[ought] this action on their own behalf and as a class action on behalf of others similarly situated," *id.* at 3, ¶ 6, and advanced "class action allegations" for the class of Pembina Award beneficiaries intended to respond to the court's class action requirements under RCFC 23, *id.* at 3–5, ¶¶ 6–13. Plaintiffs alleged that the size of the class was believed to number approximately 28,000 members "resid[ing] throughout the country although mainly in North Dakota, Montana, and Minnesota." *Id.* at 3, ¶ 7. On September 30, 1992, plaintiffs filed a motion requesting certification of a class. *See* Plaintiffs' Motion to Certify Class Action and to Defer Consider-

ation of the Motion at 1. Plaintiffs also requested that consideration of the motion for certification be deferred pending discovery as to potential class members. *Id.* at 3–4.

### 1. Plaintiffs' Motion to Amend Complaint to Add the White Earth Tribe

On August 1, 2003 plaintiffs filed a motion to amend the 1992 complaint under RCFC 15(a), *see* RCFC 15(a) (allowing a party to amend its complaint by leave of the court), to add the White Earth Tribe of Chippewa Indians, a named tribal beneficiary of both the 1971 and 1982 Distribution Acts, as a plaintiff. *See* Plaintiffs' Motion to Amend the Complaint to Add the White Earth Tribe as a Plaintiff (Pls.' Mot. to Add or Motion to Add) at 1. Defendant's briefing correctly identified the legal issue presented by plaintiffs' Motion to Add to be one of relation back under RCFC 15(c)(3). *See* Defendant's Response to Plaintiffs' Motion to Amend the Complaint to Add the White Earth Tribe as a Plaintiff (Def.'s Resp.) at 12. RCFC 15(c) allows an amendment of a pleading to relate back to the date of the original pleading under the following conditions:

> (c) *Relation Back of Amendments.* An amendment of a pleading relates back to the date of the original pleading when
>
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

RCFC 15(c). In *Creppel v. United States,* 33 Fed.Cl. 590 (1995), this court, in a decision relied upon by defendant, *see* Def.'s Resp., at 13–14, 20–21, determined that the appropriate test for assessing whether a claim "arose out of the conduct, transaction or occurrence set forth in the original pleading" as called for under RCFC 15(c)(2), was " 'whether the general fact situation or the aggregate of the operative facts underlying the claim for relief in the first petition gave notice to the government of the new matter.' " *Creppel,* 33 Fed. Cl. at 594 (quoting *Vann v. United States,* 190 Ct.Cl. 546, 420 F.2d 968, 974 (1970) (construing a rule identical to RCFC 15(c))). The court finds that this test is satisfied without question by the specific facts of this case.

At the heart of plaintiffs' claims against the government is the allegation that the government mismanaged and otherwise failed properly to invest the Pembina Awards from the time the funds were appropriated to the time of their distribution to per capita beneficiaries, and (with respect to certain funds held in trust) thereafter. *See* Compl. at 10–11, ¶¶ 28–32. It appears, consistent with plaintiffs' allegations, *see* Pls.' 2d Am. Compl. at 17–18, 20, ¶¶ 50–51, 58, that the moneys deposited into the Treasury from the 1964 and 1980 Awards were maintained in separate accounts for each award but were not distributed to tribe-specific accounts until the time of distribution to the per capita beneficiaries.

With respect to the 1964 Award, it appears unlikely that any funds could have been deposited in tribe-specific trust accounts either prior to or following the per capita distribution of the 1964 Award. It would not have been possible for funds to have been deposited to tribe-specific accounts based on the proportion of Pembina descendants in any tribe prior to the completion of the roll of eligible beneficiaries in October 1984. *See* Def.'s Consol. Opp. Exs., Ex. 1 (Declaration of Earl J. Azure), at 2, ¶ 5. Per capita distributions of the 1964 Award took place "on or about October 18, 1984" to eligible beneficiaries of the Turtle Mountain Band, Minnesota Chippewa Tribe (White Earth Band), and the nonmember lineal descendants. *Id.* at 3, ¶ 5(d). The distribution to per capita beneficiaries of the Chippewa Cree Tribe of the

Rocky Boy's Reservation took place on or around December 18, 1984. *Id.* ¶ 5(e). It appears that, from the time of the deposit of the 1964 Award into the Treasury until October 1984 at the earliest, the 1964 Award was not maintained in tribe-specific accounts.

The 1982 Distribution Act for the 1980 Award provided for allocation of funds based on the proportion of enrolled members of each tribe to the total number of enrolled tribe members and nonmember lineal descendants. 1982 Distribution Act § 2. With respect to the four tribal beneficiaries, eighty percent of their respective portions was distributed to tribe members on a per capita basis and the remaining twenty percent was retained in trust in tribal program funds. *Id.* §§ 3–6. The deposit of the 1980 Award into tribe-specific accounts would therefore be dependent on the completion of the rolls of eligible tribe members and eligible nonmember lineal descendants. The government's handling of the 1980 Award was described in the following terms by an accountant in the Office of the Special Trustee:

> Simply put, the original 1980 appropriation was placed in account 9172 and interest earned by investing the award was placed in account 9672. Similarly, the original 1981 appropriation was placed in account 9244 and interest earned by investing the award was placed in account 9744. Following the partial distributions of 1988, 1989 and 1991, the remaining funds had been divided among twenty-eight (28) accounts for tracking purposes. For purposes of the final distribution in 1994, the accounts were simultaneously recombined and distributed to the respective beneficiaries' trust (i.e., the tribal programming accounts and the per capita accounts) in the amounts dictated by the methodology. At this point in the process, the original judgment award accounts had a zero balance and ceased to exist as judgment award accounts. Each tribal group had its separate program account, and each per capita group had its separate per capita account.

Def.'s SOL MTD Mem.App. E, at 21 (Declaration of James H. Stephens).

It is the court's understanding that from the time of their deposit in the Treasury in 1980 and 1981 until at least 1988 when the Department of the Interior had finalized a list of eligible tribal members and nonmember Pembina descendants as required under the 1982 Distribution Act, all 1980 Award funds were treated alike in terms of investment and accounting. *See id.* at 26 (Outline of Division of the Pembina Awards) ("The method chosen to divide the Pembina Award begins where the 1988 workpaper begins. The fund as a whole is then divided according to the final tribal percentages, and then into the per capita and programming portions."). Until the time the rolls were prepared for the per capita distribution, there was an identity of interest among the tribal beneficiaries of the Award and the group of nonmember lineal descendants. Any breach by the government of its duties in regard to the management and investment of trust funds during that time would be experienced as an injury common to and indistinguishable in effect on all named tribal beneficiaries and the group of nonmember lineal descendants. The " 'general fact situation [and] the aggregate of the operative facts underlying the claim for relief,' " *Creppel,* 33 Fed.Cl. at 594, would therefore be identical for the White Earth Tribe, the original tribal plaintiffs, and the group of nonmember lineal descendants. The identity of interests with the original plaintiffs also " 'warrant[s] the conclusion that the government received adequate notice of the possibility that it might have to defend against a broader claim.' " *Id.* at 595.

The court in *Baldwin Park Community Hospital v. United States,* 231 Ct.Cl. 1011, 1982 WL 25837 (1982), noted substantial precedent for the finding that "relation back is appropriate where the amended pleading relates to the same conduct, transaction, or occurrence set forth in the original pleading. The rationale for this rule is that the opposite party had received timely notice of the claim asserted against him." *Id.* at 1012. Because the government's account management and investment decisions would affect all Pembina beneficiaries alike, the delay of the White Earth Tribe in joining the suit will not unduly prejudice the defendant. *See id.*

(finding that "the defendant is not prejudiced by the amendment [to add 36 additional plaintiffs] because the amended claims are not new or different, but rather virtually identical to the original claims").

The court in *Creppel* cited two cases, *Snoqualmie Tribe of Indians v. United States*, 178 Ct.Cl. 570, 372 F.2d 951 (1967) and *Baldwin Park*, 231 Ct.Cl. 1011, as establishing binding precedent for the proposition that "when additional parties are to be added under RCFC 15(c), the new parties must bear a formal connection to the original plaintiffs apart from the shared experience of alleged government misconduct." *Creppel*, 33 Fed.Cl. at 596. Defendant is aware that the tribe to be added, the White Earth Tribe of Chippewa Indians, was recognized as a tribal beneficiary under both the 1971 and 1982 Distribution Acts. *See, e.g.*, Def.'s Class Opp. at 6 ("[The 1971 Distribution] Act required the Secretary: (1) to prepare a roll of lineal descendants of member of the Pembina Band as constituted in 1863 . . .; [and] (2) to determine which enrollees were members of the Minnesota Chippewa Tribe (which includes the White Earth Band) . . . ."); *id.* at 9 ("The 1982 Distribution Act directed the Department to divide the 1980 Award . . . among: (1) the Turtle Mountain Band; (2) the Rocky Boy's Band; (3) the White Earth Band; (4) the Little Shell Tribe; and (5) 'the nonmember Pembina descendants (as a group) . . . .'") (footnote omitted); *see also* 1971 Distribution Act § 5 (providing that "the governing body of the Minnesota Chippewa Tribe shall act in concert with the General Council of the Pembina Band of Chippewa Indians of the White Earth Reservation . . ."); 1982 Distribution Act § 5 (authorizing the White Earth Reservation Business Committee to use the accrued interest and investment income from the tribal portion of the 1980 Award).

Nevertheless, defendant asserts that "[i]t need not be belabored that the White Earth Tribe does not share 'a formal connection to the original plaintiffs apart from the shared experience of alleged government misconduct.'" Def.'s Resp. at 16 (quoting *Creppel*, 33 Fed.Cl. at 596). The court believes that, contrary to the government's view, there is a strong "formal connection" between the White Earth Tribe and the original plaintiffs which dates from the time of the land cessions to the present.

The formal connection among the three original tribal plaintiffs and the White Earth Tribe is not alleged government misconduct, found insufficient as a basis for adding parties under *Creppel*, 33 Fed.Cl. at 596, but the historic relationship among the Chippewa bands that made up the Pembina Band of Chippewa who were party to the Treaty of 1863 and the Agreement of 1892, respectively providing the bases for the compensation claims underlying the 1964 and 1980 Awards. *See, e.g.*, *Turtle Mountain Band of Chippewa*, 490 F.2d at 938 ("In 1863, the Pembina Band of Chippewas ceded to the Federal Government the area . . . immediately to the east of the lands involved in this claim. By 1875, the Government had compelled a substantial part of the Pembinas, on threat of loss of their annuities from the 1863 cession, to move from the unceded portion (the lands now in dispute) to the White Earth reservation in Minnesota."); *Red Lake, Pembina and White Earth Bands*, 164 Ct.Cl. at 393–99 (regarding challenge by appellant Indians to the size of the judgment, calculation of offsets, and distribution between tribes of the Indian Claims Commission award from the 1863 Treaty). The court disagrees with defendant's assertion that the White Earth Tribe lacks a formal connection with the original tribal plaintiffs and finds that the relationship among the original parties and the party to be added is long-standing, recognized in case law and in statute, and fully satisfies the requirement under RCFC 15(c) for the addition of the White Earth Tribe as a plaintiff in this suit.

2. Plaintiffs' Renewed Motion for Class Certification

■ Plaintiffs filed their Second Amended Class Action Complaint on September 3, 2004, along with a Renewed Motion for Class Certification. The Second Amended Class Action Complaint adds the White Earth Tribe and thirty-four named individuals as plaintiffs and "class members" of a class consisting of "all beneficiaries of the Pembina

Judgment Fund and/or their successors in interest." Pls.' 2d Am. Compl. at 30, ¶ 95(a). Each individual named plaintiff is alleged to be a beneficiary of a distribution from the Pembina Awards or the heir, descendant or successor in interest of a beneficiary. *Id.* at 23–25, ¶¶ 70–78. Plaintiffs estimate the size of the class to be as many as 50,000 individuals. *Id.* at 25, ¶ 79. The named individual plaintiffs represent four sub-groups of the class of individual Indians who were beneficiaries of the 1964 Award (eligible members of the Turtle Mountain Band, Chippewa Cree Tribe, and White Earth Band, and the group of nonmember Pembina lineal descendants) and five subgroups of the class of individual Indians who were beneficiaries of the 1980 Award (eligible members of the Turtle Mountain Band, Chippewa Cree Tribe, Little Shell Tribe, and White Earth Band, and the group of nonmember Pembina lineal descendants).

Defendant opposes class certification on timeliness grounds and argues that plaintiffs' class action motion should be deferred until the statute of limitations jurisdictional issues are resolved. Def.'s Class Opp. at 17. The court addressed the limitations issues above and found that this court has jurisdiction over plaintiffs' claims under the holding of the Federal Circuit in *Shoshone* that the statute of limitations does not begin to run on claims for "losses to or mismanagement of

trust funds" until the claimants are presented with a meaningful accounting. *Shoshone,* 364 F.3d at 1347. The government has failed to show that a meaningful accounting had been presented to the original plaintiffs at the time the suit was filed, or that either the White Earth Band or the per capita beneficiaries of the 1964 Award and the 1980 Award received a meaningful accounting prior to the respective dates when their joinder was sought by the original plaintiffs. The addition of the White Earth Band and of the thirty-four named individuals as plaintiffs is therefore not time-barred.

Plaintiffs argue for class certification on the grounds that a class action is superior to other methods for the fair and efficient adjudication of plaintiffs' claims and that class certification will facilitate and expedite the just and efficient resolution of issues. Pls.' 2d Am. Compl. at 28, ¶¶ 85–86. Plaintiffs also argue that their motion for certification satisfies this court's class action rule, RCFC 23,[20] and the criteria set forth in *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972). *See* Pls.' Ren. Class Mot. at 18–30. The court's class action rule, revised in 2002 and amended in 2004, "[i]n the main ... adopts the criteria for certifying and maintaining a class action set forth in *Quinault.*" RCFC 23, Rules Committee Notes to 2002 Revision.[21] Defendant

---

**20.** RCFC 23 provides four "prerequisites to class action" and two additional factors that determine whether a class action may be maintained:

(a) Prerequisites to a Class Action. One or more members of a class may sue as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the United States has acted or refused to act on grounds generally applicable to the class; and

(2) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods

for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by members of the class; and (C) the difficulties likely to be encountered in the management of a class action.

RCFC 23.

**21.** The criteria identified in *Quinault* are:

(i) the [members] constitute a large but manageable class, (ii) there is a question of law ... common to the whole class, (iii) this common legal issue is a predominant one, overriding any separate factual issues affecting the individual members, (iv) the claims of the present plaintiffs are typical of the claims of the class, (v) the Government has acted on grounds generally applicable to the whole class, (vi) the claims of many [members] are so small that it is doubtful that they would be pursued other

argues that plaintiffs have failed to satisfy various *Quinault* factors, especially those relating to class size and manageability, the predominance of common legal and factual concerns over divergent interests created by the presence of the tribal entities as putative class members, and the failure to present representatives whose claims are typical of those of the per capita beneficiaries due to plaintiffs' alleged inability to add a per capita beneficiary to the plaintiff group due to the statute of limitations. *See* Def.'s Class Opp. at 20–36; Def.'s Class S–Reply at 4–10.

The court has reviewed the parties' arguments in light of RCFC 23 and the factors developed under *Quinault* and does not find any significant obstacle to class certification in accordance with the *Quinault* factors. In particular, the size of the group of Pembina Awards beneficiaries, the predominance of the nearly identical legal and factual issues regarding fund accounting and investment practices over any differences of interest among the potential class members, the typicality of the claims of the original plaintiffs and those of the per capita beneficiaries, and the ability of the tribal plaintiffs to represent the interests of the per capita beneficiaries all suggest that a class action would be appropriate. The court must also consider the requirements of RCFC 23(b). Of the two provisions under RCFC 23(b), there is no doubt that the first is satisfied because "the United States has acted or refused to act on grounds generally applicable to the class." RCFC 23(b)(1). As to the provisions of RCFC 23(b)(2), however, while the court agrees with plaintiffs that common questions of law and fact predominate over any individual questions, Pls.' Ren. Class Mot. at 23, and appreciates the unique protection to the interests of per capita beneficiaries and tribal beneficiaries alike provided by the existence and continued force of the 1971 and 1982 Distribution Acts, *id.* at 24, the court is not convinced that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy," RCFC 23(b)(2).

than through this case, (vii) the current plaintiffs will fairly and adequately protect the interests of the class without conflict of interest, and (viii) the prosecution of individual actions

### 3. Jurisdiction under 28 U.S.C. § 1505 to Hear Claims by "Identifiable Groups"

This court's jurisdictional statute pertaining to Indian cases, 28 U.S.C. § 1505, authorizes this court to hear claims brought by "any tribe, band, or other identifiable group of American Indians." 28 U.S.C. § 1505 (2000).

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in *favor of any tribe, band, or other identifiable group of American Indians* residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

*Id.* (emphasis added). The original complaint in this case was brought by three tribal plaintiffs on behalf of the tribes as entities, on behalf of the members of each plaintiff tribe, and "on behalf of all of the beneficiaries of the Pembina Judgment Fund." Compl. at 2–3, ¶¶ 3–5. The beneficiaries of the funds appropriated to satisfy judgments in favor of the Pembina Band of Chippewa Indians in the 1964 and the 1980 Awards have been defined by statute and entered onto rolls prepared by the Secretary of the Interior in accordance with the terms of the 1971 and 1982 Distribution Acts. Section 2 of the 1971 Distribution Act provides: "The Secretary of the Interior shall prepare a roll of all persons born on or prior to and living on the date of this Act who are lineal descendants of members of the Pembina Band as it was constituted in 1863 . . . ." 1971 Distribution Act § 2. Section 4 provides the allocation formula for the award funds and interest earned on those funds. *See id.* § 4. The 1982 Distribution Act provides that:

> by members of the class, some in district courts and some in this court, would create a risk of inconsistent or varying adjudications. *Quinault,* 453 F.2d at 1276 (footnote omitted).

All of the funds appropriated with respect to the judgment awarded the Pembina Chippewa Indians in dockets 113, 191, 221, and 246 (less attorney fees and litigation expenses), including all interest and investment income accrued, shall be divided by the Secretary of the Interior ... among the Turtle Mountain Band of Chippewa Indians, the Chippewa Cree Tribe of Rocky Boy's Reservation, the Minnesota Chippewa Tribe, the Little Shell Band of the Chippewa Indians of Montana, and the nonmember Pembina descendants (as a group) ....

1982 Distribution Act § 2. The detailed formula for allocation of funds among the beneficiaries is provided in subsequent sections of the 1982 Distribution Act. The rolls of eligible per capita beneficiaries prepared by the government for both the 1964 Award and the 1980 Award, *see* Def.'s Class Opp. at 22, meets the requirements of binding and persuasive precedent for a finding of the existence of an "identifiable group," *see, e.g., Peoria Tribe of Indians of Okla. v. United States,* 169 Ct.Cl. 1009, 1012–13, 1965 WL 8327 (1965) (finding that the identification of two scattered families descended from the Wea nation was sufficient to support a determination by the Indian Claims Commission that the Weas constituted a tribe, band, or identifiable group); *Tee–Hit–Ton Indians v. United States,* 128 Ct.Cl. 82, 120 F.Supp. 202, 204 (1954) (finding that individuals representing the plaintiff clan constituted an identifiable group of American Indians under 28 U.S.C. § 1505 based on the clan's claim of holding land in common); *Thompson v. United States,* 122 Ct.Cl. 348, 360 (1952) (holding that because "Congress intended to enlarge the category of groups of Indians entitled to present claims ... when it added the words 'or other identifiable groups,'" the Indians of California, despite the lack of a formal tribal organization, could bring suit); *Wolfchild v. United States,* 62 Fed.Cl. 521, 539–40 (2004) (finding that the loyal Mdewakanton and their lineal descendants, identified by the government in various statutes, constituted an identifiable group under 28 U.S.C. § 1505).

The jurisdiction to hear claims brought by "any Indian tribe, band, or other identifiable group" of Indians developed out of the decision by Congress in 1946 to establish the Indian Claims Commission (ICC) with authority to hear claims against the United States falling within five enumerated classes. *See* Act of August 13, 1946, ch. 959, 60 Stat. 1049, 1050 (codified at 25 U.S.C. §§ 70–70w (1946)) (Indian Claims Commission Act).[22] The ICC was established in response to Congressional concern over a growing backlog of Indian claims awaiting jurisdictional grants from Congress, then the sole mechanism available to tribes seeking redress of grievances based on Indian treaties and agreements to bring cases before the Court of Claims. *See* H.R.Rep. No. 79–1466 (1945) ("[S]pecial jurisdictional acts can be fully considered and enacted in only a small minority of the Indian cases .... The pernicious effects of long delay and the denial of justice are thus an inherent part of the procedure under which Indian claims can be disposed of only through special act of Congress.")

The decision to include the category "other identifiable group of American Indians" as plaintiffs before the ICC, along with tribes and bands, Indian Claims Commission Act at § 2, reflected congressional concern that all legitimate claims of the Indians against the United States be provided with a forum and the opportunity to be heard. *See* H.R.Rep. No. 79–1466, at 1–2 ("The bill in its present form is designed to right a continuing wrong to our Indian citizens for which no possible justification can be asserted.... The only American citizen today who is denied such recourse to the courts is the Indian."). Similar provisions for a grouping of persons (broader than the tribe or band) who shared a common claim or injury were included in earlier draft legislation to establish an Indian Claims Commission.[23] Objecting to a recom-

---

**22.** The Indian Claims Commission terminated on Sept. 30, 1978, pursuant to section 70v of the Act. Section 70w was repealed by Act of May 24, 1949, ch. 139, 63 Stat. 89, 110.

**23.** *See, e.g.,* H.R. 6655, 74th Cong. § 2 (1935) (establishing the duty of the ICC to investigate all claims brought by "any Indian tribe, band, or communal group of American Indians"); S.1901, 75th Cong. § 2 (1937) ( also including "tribe,

mendation by the Department of Justice to remove the category "or other identifiable group" from the sections where it appeared in H.R. 4497 (which was enacted as the Indian Claims Commission Act), Felix Cohen, the Acting Solicitor of the Department of the Interior, argued:

> The exclusion of any native group from the scope of this bill would not only be an unfair discrimination but would destroy the main objective of the bill, which is to achieve a final and comprehensive solution of the Indian claims problem. If the bill be amended as [the Department of] Justice suggests, it would always be possible in the future for some Indian group to argue the necessity of additional jurisdictional legislation on the ground that it did not come within the definition of a "tribe" or "band".

Memorandum by Assistant Solicitor Felix S. Cohen regarding proposed amendments to H.R. 4497, § 2, ¶ 2 (April 22, 1946). While the ICC was designed to address the backlog of cases then before the Court of Claims, Congress also provided for the resolution of future Indian claims by extending the jurisdiction of the Court of Claims to include claims against the United States brought by any "Indian tribe, band, or other identifiable group of American Indians" accruing after the date of the approval of the Act creating the ICC. Indian Claims Commission Act § 24, 60 Stat. at 1055 (codified at 25 U.S.C. § 70w (Supp. II 1946)). A separate jurisdictional act was no longer required for Indian claims to be heard by the Court of Claims:

> The jurisdiction of the Court of Claims is hereby extended to any claim against the United States accruing after the date of the approval of this Act in favor of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limit of the United States or Alaska whenever such claim is one arising

under the Constitution, laws, treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band, or group.

*Id.* In 1949, this provision-initially placed in Title 25 (Indians) of the United States Code—was repealed and, with minor changes, recodified under Title 28 (Judiciary and Judicial Procedure). *See* Act of May 24, 1949, ch. 139, 63 Stat. 110 (codified as amended at 28 U.S.C. § 1505 (2000)). The only change in the language of the provision reflected the date of enactment of the Indian Claims Commission Act: "The Court of Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians . . . ." *Id.*

Pembina descendants were recognized as an "organized group of Indians" outside of their identity as members of a specific tribe or band by the Indian Claims Commission in 1951 in *Red Lake, Pembina and White Earth Bands*, Ind. Cl. Comm'n Docket No. 18–A (September 17, 1951), one of the cases leading to the judgment establishing the 1964 Pembina Award. At the time of the Treaty of 1863, the Pembina Band of Indians was recognized as an organized band of Indians by the United States. *See McGhee v. Creek Nation*, 122 Ct.Cl. 380, 393, 1952 WL 5944 (1952).[24] Because the Pembina Band had ceased to exist as an organized tribe in 1891, the government challenged the right of Pembina descendants to bring suit against the government. *Id.* The Indian Claims Commission, in its finding that the Pembina Band was an "organized group of Indians" and could bring suit before the Commission, explained that

---

band, or communal group of American Indians"); S. 4234, 76th Cong. § 2 (3d Sess.1940) (providing that the ICC "shall hear and determine all claims of every nature whatsoever against the United States on behalf of any Indian tribe, band, or other identifiable communal group of American Indians"); H.R. 5569, 78th Cong. § 2 (1944) (recognizing claims brought on behalf of "any Indian tribe, band, or other identifiable group of American Indians").

24. The court in *McGhee* cited extensively from the September 17, 1951 ICC opinion in *Red Lake* to support its finding that the descendants of those members of the Creek Nation as it existed in 1814 who remained east of the Mississippi River were entitled to sue as an identifiable group of Indians under § 2 of the Indian Claims Commission Act. *McGhee*, 122 Ct.Cl. at 391–92.

claimants who are permitted to assert claims under the Indian Claims Commission Act, namely, a "tribe, band, or other identifiable group" do not have to be existing political groups in order to be heard by the Commission. The controlling question is whether the claimant group can be identified and have a common claim.

[. . . .]

As the plaintiffs concede that the Pembina Indians are no longer organized as a band, the question then is whether members, or descendants of members of the Pembina Band as it existed and was recognized at the time of the 1863 treaty, can be identified. If they can be so identified, then any one of their group is authorized by express statute to present this claim as a representative of all the members, as provided by Section 10 of the Indian Claims Commission Act (25 U.S.C. [§ ] 70a), which provides that: "any claim within the provisions of this Act may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representatives of all its members."

We believe that it is such a representative action that is presented here. It is true that in the caption of the petition the Pembina Band is named as one of the plaintiff bands, which would indicate that the claim was presented by an existing organized band; however, the allegations of the petition clearly show that this claim is presented by individual members, or descendants of members, of the Pembina Band or Group of Chippewa Indians which was a party to the 1863 treaty cession of lands, out of which this claim arises, and that they are acting as the representatives of all the members or descendants of members of said band.

*McGhee,* 122 Ct.Cl. at 393–94 (quoting *Red Lake, Pembina and White Earth Bands,* Ind. Cl. Comm'n Docket No. 18–A).

The Court of Claims affirmed the ICC's recognition of the Pembina Band as an "identifiable group" and affirmed the award in the plaintiff group's favor in the face of a challenge by two organized tribal entities, the Turtle Mountain Band of Chippewa Indians and the Little Shell Band of Chippewa Indians. *See Red Lake and Pembina Bands v. Turtle Mountain Band of Chippewa Indians,* 173 Ct.Cl. 928, 355 F.2d 936, 940–41 (1965). The Court of Claims rejected the tribes' argument that "an aggregation of . . . present-day descendants [could not] constitute an 'identifiable group' under the [Indian Claims Commission] Act." *Id.* at 943.

> Congress made it very clear in the [Indian Claims Commission] Act that a claim can be prosecuted and satisfied even though no recognized tribal organization is the claimant. Awards have often been entered for such unorganized or informal groups. Since the statute imposes no organizational requirement, there is no basis for creating one by judicial gloss. And once the need for some formal organization is dismissed, we know of no outer boundary for defining an "identifiable group" which would properly stop short of a group of descendants of a once-organized tribe or band.

*Id.*

The *McGhee* court also found, in regard to the descendants of the Creek Nation who remained east of the Mississippi, that the meaning of "identifiable group" required a more limited showing of formal relationship than that required for a tribe or band.

> To identify is to establish the identity of, and if a group presenting a claim under the Act is capable of being identified as a group of Indians consisting of the descendants of members of the tribes or bands which existed at the time the claim arose, the jurisdictional requirements of the statute, in our opinion, have been met. It would, we think, be a strained and unwarranted interpretation of the [Indian Claims Commission] Act to say that Congress intended by the term "identifiable group" that the group making the claim must be identical, as a distinct entity, with the tribe or band existing at the time the claim arose.

*McGhee,* 122 Ct.Cl. at 391. The group of beneficiaries of the 1964 and 1980 Awards, as defined in the 1971 and 1982 Distribution Acts, including their heirs, descendants, and successors-in-interest, are an "identifiable group." The court finds that the "beneficia-

ries of the Pembina Judgment Fund," Compl. at 2–3, ¶¶ 3–5, are an "identifiable group of American Indians" under the terms of 28 U.S.C. § 1505 and were entitled to bring suit against the government at the time the Complaint was filed.

The recognition of beneficiaries of the 1964 and 1980 Awards as an identifiable group offers a number of advantages over either a class action under RCFC 23 or permissive joinder under RCFC 20. By recognizing the group of beneficiaries as a single group plaintiff under the original complaint, the parties may proceed to litigate the claims now before the court without delay for notification to all class members or to all potential plaintiffs entitled to joinder. A second advantage is that any amount of damages that may be awarded could be shared by all group members and not only by successful class members or particular beneficiaries joined as plaintiffs. *See Snoqualmie Tribe,* 372 F.2d at 957 ("Awards are for all members of the group and not to be shared only by successful descendant-claimants.").

The court's recognition of all beneficiaries of the 1964 and 1980 Awards as a group plaintiff does not end, but rather begins, the process of identifying and notifying potential group members of the nature and pendency of the action. However, authorities requiring notice and joinder as a condition precedent for benefiting from any possible award are not applicable to a proceeding by an identifiable group. *Cf. Wolfchild,* 62 Fed.Cl. at 554–55 (observing that notice will be required under either a class action or other means of joining those lineal descendants not then named as plaintiffs).[25]

In case of a judgment for plaintiffs, counsel for plaintiffs and defendant will be required to definitize the membership of the group of beneficiaries of the Pembina Awards. At present, the court directs the parties to agree on and propose for court approval on or before March 3, 2006 such forms and methods of notice to the group as shall serve reasonably to publicize the pen-

dency of this action and the opportunity to participate on such terms as will secure "the just, speedy, and inexpensive determination of [this] action." RCFC 1; *see* RCFC 83(b) ("A judge may regulate practice in any manner consistent with federal law ....").

III. Conclusion

For the foregoing reasons, the court orders the following:

Plaintiffs' Motion for Summary Judgment on the Issue of the General Tribal Trust Fund Investment Statutes Being "Money–Mandating" is GRANTED to the extent consistent with this Opinion and otherwise DENIED. Defendant's Cross–Motion for Partial Summary Judgment on Money–Mandating Issues and Opposition to Plaintiffs' Motion for Summary Judgment is DENIED.

Defendant's Motion to Dismiss or in the Alternative for Partial Summary Judgment [on Statute of Limitations Grounds] is DENIED. Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Partial Summary Judgment [on Statute of Limitations Grounds] is GRANTED.

Plaintiffs' Motion to Amend the Complaint to Add the White Earth Tribe as a plaintiff is GRANTED.

Plaintiffs' Renewed Motion for Class Certification is MOOT except to the extent that the court DEEMS the motion to be a motion to permit participation in the case by the thirty-four named plaintiffs identified in the motion as a part of the plaintiff group. The deemed motion to permit participation is ALLOWED.

IT IS SO ORDERED.

---

**25.** The court in *Wolfchild* instructed the parties to develop notification procedures under either RCFC 23(c)(2)(B) if plaintiffs were to proceed with a class action, or under RCFC 14(b). 62 Fed.Cl. at 554–55. A legal notice and instructions were subsequently issued by the *Wolfchild* court. See *Wolfchild v. United States,* 68 Fed.Cl. 779, App. A (2005).